**In re NETWORK 90°, INC., Debtor.**

**David R. HERZOG, As Trustee of the Estate of Network 90°, Inc., Plaintiff,**

v.

**SUNARHAUSERMAN, Defendant.**

**Bankruptcy No. 87 B 03915.
Adv. No. 87 A 0421.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

Jan. 23, 1989.

---

Jeffrey H. Hornstein, Holleb & Coff, Chicago, Ill., for plaintiff.

Kate Poverman, Sidley & Austin, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

JACK B. SCHMETTERER, Bankruptcy Judge.

On March 13, 1987, Network 90° ("Debtor") filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. Debtor then instituted this seven count Complaint against Defendant SunarHauserman seeking to avoid allegedly preferential transfers pursuant to 11 U.S.C. § 547(b). Debtor also sought to avoid two postpetition transfers pursuant to 11 U.S.C. § 549(a).

Debtor moved for Summary Judgment as to Counts V and VI of its Complaint. Defendant moved for Summary Judgment on Counts I, II III, IV and VII of the Complaint and also cross motioned for Summary Judgment on Counts V and VI.

Subsequently, this case was converted to one under Chapter 7. David R. Herzog was appointed Trustee. This Court permitted the Trustee to substitute himself as Plaintiff in the preference action. Trustee adopted the Complaint and filed an amended Motion for Summary Judgment and Partial Summary Judgment. In his amended Motion, the Trustee seeks Summary Judgment in his favor on Counts III, V and VI, and Partial Summary Judgment on Counts I, II and IV. For reasons set forth below, Plaintiff's motions for Summary Judgment are entirely denied, and Defendant's motions for Summary Judgment are entirely allowed.

### I. UNDISPUTED FACTS

The undisputed facts are taken from the pleadings, supporting materials, the joint stipulations of facts, and the papers filed by the parties pursuant to Local District Rule 12.

Network 90°, Inc. (the "Debtor") is an Illinois Corporation with its principal address in Chicago, Illinois. Its business op-

erations consisted of a dealership for full service contract furnishings. Complaint ¶ 3; Answer ¶ 3.

SunarHauserman is an Ohio Corporation with its principal office at 5711 Grant Avenue, Cleveland, Ohio 44105. It is a manufacturer of furniture, textiles, and movable walls for office interiors. Complaint ¶ 4; SunarHauserman's Amended Statement of Material Facts as to Which There is No Genuine Issue (Def. Amended Stmt. of Facts) ¶ 3.

Network 90° became a dealer of SunarHauserman products in March of 1985. SunarHauserman required that Network 90° provide it with a standby letter of credit with respect to each order, provide for direct payment from the customer to SunarHauserman, or provide that the customer make payment by means of a check jointly payable to Network 90° and SunarHauserman. In or about early July, 1985, the two parties reached the following oral agreement (the "Agreement"):

(a) Network 90° would instruct its customers to pay invoices from Network 90° with checks payable jointly to Network 90° and SunarHauserman;

(b) The customer would send the checks directly to Network 90° (or, the customer would send the check to SunarHauserman who would forward the check unendorsed to Network 90°, according to Def. Amended Stmt. of Facts at ¶ 11);

(c) Network 90° would endorse the check and send it to SunarHauserman; and

(d) SunarHauserman would endorse the check, deposit it, and remit the difference to Network 90° [Plaintiff stated in his Statement of Material Facts (at ¶ 6) that SunarHauserman would apply the proceeds of each check to pay both current invoices and Debtor's past due obligations to the Defendant]

Debtor's Statement of Material Facts (Debtor Stmt. of Facts) ¶ 6; Def. Amended Stmt. of Facts ¶¶ 10–11.

Subsequently, Network 90° agreed to an expansion of the agreement (the "Expanded Agreement"). According to the Debtor, SunarHauserman refused to sell the Debtor furnishings and equipment needed to fill an order sent to SunarHauserman on July 29, 1986 notwithstanding the original Agreement. Therefore, the Debtor orally agreed to the Expanded Agreement to induce SunarHauserman to continue to sell furnishings and equipment to it. Subsequently, the parties acted under and pursuant to the Expanded Agreement. Debtor Stmt. of Facts ¶ 9. According to SunarHauserman, by the summer of 1986 the Debtor had become substantially indebted to SunarHauserman for orders SunarHauserman had filled that were not paid with joint checks from customers, and therefore the parties agreed to the Expanded Agreement. While the litigants differ somewhat as to the origin of that agreement, there is no dispute that it was agreed to. The Expanded Agreement included the following terms:

(a) Network 90° would forward all checks it received from its customers to SunarHauserman without endorsement;

(b) Network 90° would grant SunarHauserman a power of attorney to endorse and negotiate checks that were jointly payable to Network 90° and SunarHauserman;

(c) SunarHauserman would endorse the checks, deposit them, and apply the proceeds to both the current invoices it had submitted to Network 90° and to Network 90°'s past due obligation.[1]

Debtor Stmt. of Facts ¶ 9; Def. Amended Stmt. of Facts ¶ 13.

Additional relevant undisputed facts are set forth in the discussion of the individual counts hereinbelow.

## II. THE COUNTS CHARGED

### A. *Count I*

In Count I the Trustee alleges that the cashing of Time, Inc. check number 177693

---

**1.** Debtor's Statement of Undisputed Facts states that this term was part of the original Agreement rather then a term added by the Expanded Agreement. Although it disputes whether or not this term was part of the original Agreement, it is undisputed that the term was included in the Expanded Agreement.

by SunarHauserman constituted a preferential transfer under § 547(b) of the Bankruptcy Code, and can therefore be avoided. In their joint stipulation the parties stipulate to the following facts concerning Count I:

1. On or about September 25, 1986, Time Inc. ("Time") submitted purchase order no. 36756 for office equipment, furnishings and installation services from the Debtor ("Time–PO # 36756"). Time–PO # 36756 was addressed to the Debtor and SunarHauserman at 430 West Erie, Chicago, Il 60610.

2. On or about September 25, 1986, the Debtor submitted purchase order nos. 3089, 3089A ("N90–PO # 3089" and "N90–PO # 3089A") to the Defendant for the equipment and furnishings needed to fill Time–PO # 36756.

3. SunarHauserman acknowledged N90–PO # 3089 and N90–PO # 3089A and supplied the equipment and furnishings that the Debtor ordered pursuant to them which the Debtor needed to fill Time–PO # 36756. SunarHauserman later submitted invoices nos. 360790–1, 1016200, 1016304, 1016694, 1016280 and 1017451 to the Debtor for such furnishings and equipment.

4. On or about October 17, 1986, the Debtor submitted purchase order no. 3206 ("N90–PO # 3206") to the Defendant for additional equipment and furnishings needed to fill Time–PO # 36756.

5. SunarHauserman acknowledged N90–PO # 3206 and supplied the equipment that the Debtor ordered pursuant to it which the Debtor needed to fill Time–PO # 36756. SunarHauserman later submitted invoice no. 1017267 to the Debtor for such furnishings and equipment.

6. On or about January 22, 1987, the Debtor submitted invoice nos. 902003 and 901983 ("N90–I # 902003" and "N90–I # 901983") to Time for the equipment, furnishings and installation services which the Debtor provided to Time pursuant to Time–PO # 36756.

7. On or about October 29, 1986, Time submitted purchase order no. 36958 for office equipment, furnishings and installation services from the Debtor ("Time–PO # 36958"). Time–PO # 36958 was addressed to the Debtor.

8. On or about October 30, 1986, the Debtor submitted purchase order no. 3268 ("N90–PO # 3268") to SunarHauserman for the equipment and furnishings needed to fill Time–PO # 36958.

9. SunarHauserman acknowledged N90–PO # 3268 and supplied the equipment and furnishings that the Debtor ordered pursuant to it which the Debtor needed to fill Time–PO # 36958. On or about January 9, 1987, the Defendant submitted invoice no. 1017268 to the Debtor for such furnishing and equipment.

10. On or about January 22, 1987, the Debtor submitted invoice no. 901984 ("N90–I # 901984") to Time for the equipment, furnishings and installation services which the Debtor provided to Time pursuant to Time–PO # 36958.

11. On or about February 18, 1987, Time issued check no. 177693 ("Time-ck # 177693") in the sum of $222,085.40 as payment for the equipment, furnishings and services covered by N90–I # 902003 and N90–I # 901984.

12. Time-ck # 177693 was made jointly payable to the Debtor and SunarHauserman.

13. The Defendant endorsed the Debtor's name on Time-ck # 177693 and cashed it.

In its Answer to the Complaint, SunarHauserman alleges the following affirmative defenses:

The complaint fails to state a claim upon which relief can be granted.

The check Defendant received never constituted property of the Debtor's estate and thus there was no preferential transfer of Debtor's property.

To the extent that the Debtor may have had an interest in the proceeds of the check negotiated by Defendant, the transfer to Defendant was (a) in payment of debts incurred by the Debtor in the ordinary course of the Debtor's business or in the ordinary course of the Debtor's

and Defendant's financial affairs; (b) made in the ordinary course of business or financial affairs of Debtor and Defendant; and (c) made according to ordinary business terms.

Debtor's claim to the proceeds of the check arose out of the same transaction as SunarHauserman's claim against the Debtor. Accordingly, SunarHauserman is entitled to retain the proceeds of this check under the doctrine of recoupment.

In Defendant's Motion for Summary Judgment (Def. Motion for S.J.) and supporting Memorandum, it further alleges (citing the affidavit of the Manager of Credit and Collections for SunarHauserman, Mr. Cebula, ¶ 11) that in late January or early February of 1987, SunarHauserman contacted Time, TTM and United, the issuers of the joint checks, and requested them to send the joint checks directly to SunarHauserman. SunarHauserman's affidavit states that the checks were sent directly to it, and cashed pursuant to the Expanded Agreement. (Cebula Aff. ¶ 12). That assertion was not contradicted by Plaintiff. Therefore, SunarHauserman argues that the Debtor never had physical possession of the joint checks, and had neither the power nor the discretion to determine how the proceeds of the joint checks were to be applied. Def. Motion for S.J. ¶¶ 14, 15, 17, & 30–32; Memorandum, at 4–7. In Plaintiff's Memorandum in Response to Defendant's Cross Motion for Summary Judgment, the Trustee admits that the facts set forth in Defendant's Memorandum are accurate in a general sense, and the Trustee did not contravene, through affidavit or otherwise, the asserted handling of the checks.

The Trustee seeks Partial Summary Judgment on Count I in the amount of $194,376.18, the amount from Time-ck. # 177693 which the Defendant applied to past due invoices between the Debtor and the Defendant. Trustee's Amended Motion for Summary Judgment and Partial Judgment (Trustee's Amended Motion for S.J.), at 4–5, & 9–10.

### B. *Count II*

Count II alleges that the cashing of Time check number 178369 by SunarHauserman constituted a preferential transfer under § 547(b) of the Bankruptcy Code, and can therefore be avoided. In their joint stipulation the parties stipulate to the following facts concerning Count II:

14. On or about August 4, 1986, Time submitted purchase order no. 36415 for office equipment, furnishings and installation services from the Debtor ("Time–PO # 36415"). Time–PO # 36415 was addressed to the Debtor.

15. On or about July 31, 1986, the Debtor submitted purchase order no. 2853 ("N90–PO # 2853") to the Defendant for the equipment and furnishings needed to fill Time–PO # 36415.

16. Defendant acknowledged N90–PO # 2853 and supplied the equipment and furnishings that the Debtor ordered pursuant to it which the Debtor needed to fill Time's PO # 36415. The Defendant later submitted invoice nos. 1014548, 1014743 and 1015810 to the Debtor for such furnishings and equipment.

17. On or about December 5, 1986, the Debtor submitted invoice no. 901823 ("N90–I # 901823") to Time for the equipment, furnishings and installation services which the Debtor provided to Time pursuant to Time–PO # 36415.

18. On or about March 3, 1987, Time issued check no. 178369 ("Time-ck # 178369") in the sum of $105,328.75 as payment for the equipment, furnishings and services covered by N90–I # 901823.

19. Time-ck # 178369 was made jointly payable to the Debtor and the Defendant.

20. The Defendant endorsed the Debtor's name on Time-ck # 178369 and cashed it.

SunarHauserman pleads the same affirmative defenses as it plead to Count I. In its Motion for Summary Judgment, and supporting Memorandum, SunarHauserman again alleges (relying on Cebula Affidavit ¶ 14) that Time-ck # 178369 was mailed directly to it and was cashed pursuant to the Expanded Agreement. There-

fore, SunarHauserman argues that the Debtor had no discretion over how the proceeds of the check were applied. Def. Motion for S.J. ¶¶ 14, 15, 17, & 39–41; Memorandum, at 4–7. As stated above, in Plaintiff's Memorandum in Response to Defendant's Cross Motion for Summary Judgment, the Trustee admits that the facts set forth in Defendant's Memorandum are accurate in a general sense. Furthermore, the Trustee did not contravene, through affidavit or otherwise, the asserted handling of the check.

The Trustee seeks Partial Summary Judgment on Count II in the amount of $102,740.41, the amount from Time-ck. # 178369 which the Defendant applied to past due invoices between the Debtor and the Defendant. Trustee's Amended Motion for S.J., at 5–6, & 10.

### C. *Count III*

Count III alleges that the cashing of TTM check number 501031 by SunarHauserman constituted a preferential transfer under § 547(b) of the Bankruptcy Code, and can therefore be avoided. In their joint stipulation the parties stipulate to the following facts concerning Count III:

21. On or about November 10, 1986, Time Telephone Marketing ("TTM") submitted purchase order no. 02000 for office equipment, furnishings and installation services from the Debtor ("TTM–PO # 02000"). TTM–PO # 02000 was addressed to the Debtor and SunarHauserman.

22. On or about November 11, 1986, the Debtor submitted purchase order no 3121 ("N90–PO # 3121") to the Defendant for the equipment and furnishings needed to fill TTM–PO # 02000.

23. Defendant acknowledged N90–PO # 3121 and supplied the equipment and furnishings that the Debtor ordered pursuant to it which the Debtor needed to fill TTM's PO # 02000. The Defendant later submitted invoice no. 1015452 to the Debtor for such furnishings and equipment.

24. On or about November 28, 1986, the Debtor submitted invoice no. 901803 ("N90–I # 901803") to TTM for the equipment, furnishings and installation services which the Debtor provided to TTM pursuant to TTM–PO # 02000.

25. On or about December 23, 1986, TTM issued check no. 501031 ("TTM-ck # 501031") in the sum of $111,286.41 as payment for the equipment, furnishings and services covered by N90–I # 901803.

26. TTM-ck # 501031 was made jointly payable to the Debtor and SunarHauserman.

27. The Defendant endorsed the Debtor's name on TTM-ck # 501031 and cashed it.

SunarHauserman pleads the same affirmative defenses as it plead to Counts I & II. In its Motion for Summary Judgment and supporting Memorandum, SunarHauserman alleges (relying on Cebula Aff. ¶ 16) that Time-ck # 501031 was mailed directly to it and was cashed pursuant to the Expanded Agreement. Therefore, SunarHauserman argues that the Debtor had no discretion over how the proceeds of the check were applied. Def. Motion for S.J. ¶¶ 14, 15, 17, & 48–50; Memorandum, at 4–7. In Plaintiff's Memorandum in Response to Defendant's Cross Motion for Summary Judgment, the Trustee admits that the facts set forth in Defendant's Memorandum are accurate in a general sense. The Trustee did not contravene through affidavit or otherwise, the asserted handling of the check.

The Trustee seeks Summary Judgment on Count III in the amount of $111,286.41, the amount from Time-ck # 501031 which the Defendant applied to past due invoices between the Debtor and the Defendant. Trustee's Amended Motion for S.J., at 6–7, & 10.

### D. *Count IV*

Count IV alleges that the cashing of Time check number 174322 by SunarHauserman constituted a preferential transfer under § 547(b) of the Bankruptcy Code, and can therefore be avoided. In their joint stipulation the parties stipulate to the following facts concerning Count IV:

28. On or about June 10, 1986, Time submitted purchase order no. 36061–A, B and C for office equipment, furnishings

and installation services from the Debtor ("Time–PO #36061–A, B and C"). Time–PO #36061–A, B and C was addressed to the Debtor.

29. On or about July 8, 1986, the Debtor submitted purchase order nos. 2459A, 2459B and 2459C ("N90–PO #2459A," "N90–PO #2459B" and "N90–PO #2459C") to the Defendant for the equipment and furnishings needed to fill Time–PO #36061–A, B and C.

30. Defendant acknowledged N90–PO #2459A, N90–PO #2459B and N90–PO #2459C and supplied the equipment and furnishings that the Debtor ordered pursuant to them which the Debtor needed to fill Time's PO #36061–A, B and C. The Defendant later submitted invoice nos. 1014007 and 1012897 for the equipment and furnishings covered by N90–PO #2459A. It submitted invoice nos. 1013078, 1012898, 1013311 and 1013179 for the furnishings and equipment covered by N90–PO #2459B. It also submitted invoice nos. 1012728 and 1013079 to the Debtor for the furnishings and equipment covered by N90–PO #2459C.

31. On or about October 1, 1986, the Debtor submitted invoice no. 901626 ("N90–I #901626") to Time for the equipment, furnishings and installation services which the Debtor provided to Time pursuant to Time–PO #36061–A.

32. On or about October 1, 1986, the Debtor submitted invoice no. 901624 ("N90–I #901624") to Time for the equipment, furnishings and installation services which the Debtor provided to Time pursuant to Time–PO #36061–B.

33. On or about October 1, 1986, the Debtor submitted invoice no. 901625 ("N90–I #901625") to Time for the equipment, furnishings and installation services which the Debtor provided to Time pursuant to Time–PO #36061–C.

34. On or about December 17, 1986, Time issued check no. 174322 ("Time-ck #174322") in the sum of $83,410.79 as payment for the equipment, furnishings and services covered by N90–I #901626, N90–I #901624 and N90–I #901625 and Network 90 invoice no. 901483. Network 90 invoice no. 901483 was submitted to

Time for equipment, furnishings and installation services provided to Time pursuant to Time purchase order no. 34539.

35. Time-ck #174322 was made jointly payable to the Debtor and SunarHauserman.

36. SunarHauserman endorsed the Debtor's name on Time-ck #174322 and cashed it.

SunarHauserman pleads the same affirmative defenses as it plead to Counts I, II and III. In its Motion for Summary Judgment and supporting Memorandum, SunarHauserman alleges (relying on Cebula Aff. ¶18) that Time-ck #174322 was mailed directly to it and was cashed pursuant to the Expanded Agreement. Therefore, SunarHauserman argues that the Debtor had no discretion over how the proceeds of the check were applied. Def. Motion for S.J. ¶¶14, 15, 17, & 59–60; Memorandum, at 4–7. In Plaintiff's Memorandum in Response to Defendant's Cross Motion for Summary Judgment, the Trustee admits that the facts set forth in Defendant's Memorandum are accurate in a general sense. Furthermore, the Trustee did not contravene, through affidavit or otherwise, the asserted handling of the check.

The Trustee seeks partial summary judgment on Count IV in the amount of $64,017.89, the amount from Time-ck #174322 which the Defendant applied to past due invoices between the Debtor and the Defendant. Trustee's Amended Motion for S.J., at 7–8, & 10.

### E. *Count V*

Count V alleges that the cashing of TTM check number 516388 by SunarHauserman constituted an unauthorized postpetition transfer of property of the Debtor's estate, and therefore the transfer is void under 11 U.S.C. § 549(a). Trustee further alleges that SunarHauserman should be required to turn over the check amount to the Trustee as required under § 550.

The parties agree on the following facts which relate to Count V:

1. On or about July 28, 1986, TTM submitted to Network 90° purchase order no. 01079 ("TTM–PO #01079") for office

equipment, furnishings and installation services. Def. Motion for S.J. ¶ 61; Debtor's Motion for S.J. ¶ 9.

2. On or about July 29, 1986, the Debtor submitted purchase order no. 2816 ("N90–PO # 2816") to SunarHauserman for the equipment and furnishings necessary to fill TTM–PO # 01079. Def. Motion for S.J. ¶ 62; Debtor's Motion for S.J. ¶ 9.

3. SunarHauserman filled N90–PO # 2816 pursuant to the terms of the Expanded Agreement. Def. Motion for S.J. ¶ 63; Debtor's Motion for S.J. ¶ 11.

4. Upon filling the Debtor's order, SunarHauserman submitted its invoice no. 1015809 to the Debtor for such furnishings and equipment. Def. Motion for S.J. ¶ 64; Debtor's Motion for S.J. ¶ 11.

5. On or about December 5, 1986, the Debtor submitted invoice no. 901857 ("N90–I # 901857") to TTM for the equipment, furnishings and installation services which the Debtor provided to TTM pursuant to TTM–PO # 01079. Def. Motion for S.J. ¶ 65; Debtor's Motion for S.J. ¶ 12.

6. On or about September 18, 1986, TTM submitted purchase order no. 1153 ("TTM–PO # 1153") for additional office equipment and furnishings from the Debtor. Def. Motion for S.J. ¶ 66; Debtor's Motion for S.J. ¶ 13.

7. On September 19, 1986, the Debtor submitted purchase order no 3050 ("N90–PO # 3050") to SunarHauserman for the equipment and furnishings necessary to fill TTM–PO # 1153. Def. Motion for S.J. ¶ 67; Debtor's Motion for S.J. ¶ 14.

8. SunarHauserman filled the Debtor's September 19, 1986 order subject to the terms of the Expanded Agreement. Def. Motion for S.J. ¶ 68; Debtor's Motion for S.J. ¶ 15.

9. SunarHauserman submitted invoice no. 1016015, dated December 4, 1986, to Network 90° for the equipment and furnishings supplied pursuant to N90–PO # 3050. Def. Motion for S.J. ¶ 69; Debtor's Motion for S.J. ¶ 16.

10. On December 5, 1986, the Debtor submitted invoice no. 901858 (N90–I

# 901858) to TTM for the equipment and furnishings which the Debtor provided to TTM pursuant to TTM–PO # 1153. Def. Motion for S.J. ¶ 70; Debtor's Motion for S.J. ¶ 17.

11. On or about March 13, 1987, TTM issued its check no. 516388 ("TTM-ck # 516388") in the sum of $42,002.69 as payment for the equipment, furnishings, and services covered by N90–I # 901857 and N90–I # 901858. Def. Motion for S.J. ¶ 71; Debtor's Motion for S.J. ¶ 18.

12. Under the Expanded Agreement, TTM-check # 516388 was made payable jointly to Debtor and SunarHauserman. Def. Motion for S.J. ¶ 72; Debtor's Motion for S.J. ¶ 19.

13. SunarHauserman endorsed the Debtor's name on TTM-ck # 516388 and cashed it. Def. Motion for S.J. ¶ 74; Debtor's Motion for S.J. ¶ 20.

SunarHauserman alleged the following affirmative defenses to Count V:

The Complaint fails to state a claim upon which relief can be granted.

The check never constituted property of the Debtor's estate, and as a result did not constitute a postpetition transfer of the Debtor's property.

The Debtor's claim to the proceeds of the check arose out of the same transaction as SunarHauserman's claim against the Debtor, accordingly, SunarHauserman is entitled to retain the proceeds of the check under the theory of recoupment.

SunarHauserman's Motion for Summary Judgment and its supporting Memorandum also state (relying on Cebula Aff. ¶ 20) that TTM-ck # 516388 was mailed directly to it. Def. Motion for S.J. ¶ 73; Memorandum, at 4–7. Plaintiff's Memorandum in Response to Defendant's Cross Motion for Summary Judgment admits that the facts as set forth in Defendant's Memorandum are accurate in a general sense. Also, the Plaintiff did not contravene, through affidavit or otherwise, the asserted handling of the check.

## F. *Count VI*

Count VI alleges that the cashing to UAL check number 369046 by SunarHauserman constituted an unauthorized postpetition transfer of property of the Debt-

or's estate, and therefore the transfer is void under § 549(a). Trustee further alleges that SunarHauserman should be required to turn over the check amount to the Trustee as required under § 550.

The parties agree on the following facts which relate to Count VI:

1. On or about November 14, 1986, United Airlines ("UAL") submitted purchase order no. 48749 ("UAL–PO # 48749") for office equipment and furnishings from the Debtor. Def. Motion for S.J. ¶ 76; Debtor's Motion for S.J. ¶ 28.

2. To fill UAL's November 14, 1986 order, the Debtor submitted purchase order 3385 ("N90–PO # 3385"), dated November 18, 1986, to SunarHauserman. Def. Motion for S.J. ¶ 77; Debtor's Motion for S.J. ¶ 29.

3. SunarHauserman filled N90–PO # 3385 subject to the terms of Expanded Agreement. Def. Motion for S.J. ¶ 78; Debtor's Motion for S.J. ¶ 30.

4. SunarHauserman submitted invoice nos. 1017020, 1016990, and 1017269 to the Debtor for equipment and furnishings supplied pursuant to N90–PO # 3385. Def. Motion for S.J. ¶ 79; Debtor's Motion for S.J. ¶ 31.

5. On or about February 3, 1987, the Debtor submitted invoice no. 902018 ("N90–I # 902018") to UAL for the equipment and furnishings which the Debtor provided pursuant to UAL–PO # 48749. Def. Motion for S.J. ¶ 80; Debtor's Motion for S.J. ¶ 32.

6. On or about March 26, 1987, UAL issued its check no. 369046 ("UAL-ck # 369046") in the sum of $165,953.20 as payment for the equipment, and furnishings, and services covered by N90–I # 902018. Def. Motion for S.J. ¶ 81; Debtor's Motion for S.J. ¶ 33.

7. Under the Expanded Agreement, UAL-ck # 369046 was made jointly payable to the Debtor and SunarHauserman. Def. Motion for S.J. ¶ 82; Debtor's Motion for S.J. ¶ 34.

SunarHauserman makes the same affirmative defenses as it made to Count V. Also, SunarHauserman contends, citing the affidavit of the Manager of Credit and Collections for SunarHauserman ¶ 22, that UAL-ck # 369046 was mailed directly to SunarHauserman. Def. Motion for S.J. ¶ 83, Memorandum, at 4–7. As stated previously, Debtor's Memorandum in Response to Defendant's Cross Motion for Summary Judgment admits that the facts as set for in Defendant's Memorandum are accurate in a general sense, and the Trustee did not contravene the asserted handling of the checks. Debtor's Memorandum in Response to Cross Motions for S.J., at 2.

### G. *Count VII*

In Count VII, the Trustee alleges that SunarHauserman may have cashed and retained the proceeds of other checks made payable jointly to Network 90° and Sunar-Hauserman on or within ninety days of the Debtor's filing of Chapter 11. The Complaint charges that SunarHauserman is accountable to the Debtor under §§ 547(b) and 549(a) for any monies received by it, on or within ninety days of the filing, or subsequent to such filing, pursuant to the cashing of jointly payable checks. The Complaint requests a full and complete accounting of any such monies received.

SunarHauserman denies receiving the proceeds of any other joint checks on or within ninety days of the filing of the Chapter 11 case, or subsequent to such filing. In Defendant's Motion for Summary Judgment on Count VII (and also Sunar-Hauserman's Amended Statement of Material Facts), Defendant alleges the following:

89. Other than Time-ck # 177693, Time-ck # 178369, TTM-ck # 501031 and Time-ck # 174322, SunarHauserman did not receive or negotiate any checks that were jointly payable to it and the Debtor in the ninety days before the Debtor filed its petition for relief. (Cebula Aff. ¶ 24).

90. Other than TTM-ck # 516388 and UAL-ck # 369046, SunarHauserman did not receive or negotiate any postpetition checks that were jointly payable to it and the Debtor after March 13, 1987, the date the Debtor filed its petition for relief. (Cebula Aff. ¶ 25).

Plaintiff did not file a counter affidavit, nor did he refer to the above portions of Cebula's Affidavit. Therefore, the above portions of Defendant's affidavit and Amended Statement of Material Facts are uncontradicted.

### III. JURISDICTION & VENUE

This Adversary Complaint alleges preferential and postpetition transfers. It therefore constitutes a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(E), § 157(b)(2)(F) and § 157(b)(2)(O). This Court has authority under the General Order of Reference by the District Court to the Bankruptcy Court for this District. Venue lies in this Court under 28 U.S.C. § 1409.

### IV. SUMMARY JUDGMENT STANDARDS

Under Rule 56(c) F.R.Civ.P., summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986).

The primary purpose for granting a summary judgment motion is to avoid unnecessary trials when there is no genuine issue of material fact in dispute. *Wainwright Bank & Trust Co. v. Railroadmens Fed. Sav. & Loan Ass'n of Indianapolis*, 806 F.2d 146, 149 (7th Cir.1986). On a summary judgment motion, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513; *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. However, the existence of a material factual dispute is sufficient only if the disputed fact is determinative of the outcome under

applicable law. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

The standard for granting summary judgment mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a). *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. The primary difference between the two motions is procedural; summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on evidence that has been admitted. *Anderson*, 477 U.S. at 251, 106 S.Ct. at 2511. In essence, however, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require trial or whether one party must prevail as a matter of law. *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2511–12. In determining whether the evidence is sufficient, the court must consider the substantive evidentiary standard that would be applicable at trial (whether preponderance of evidence, clear and convincing, or other). *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir.1987), *cert. denied* — U.S. ——, 108 S.Ct. 488, 98 L.Ed. 2d 486 (1987).

Of course, a party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motions, and must identify those portions of the "pleadings, depositions, answers to interrogatories, and affidavits, if any", which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. However, once the motion for summary judgment is made and supported as described above, Rule 56(e) provides that a party opposing the motion may not rest upon the mere allegations or denials in his pleading, his response must set forth specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356.

The Court should not "weigh the evidence." However, "[i]f evidence opposing

summary judgment is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *Valley Liquors,* 822 F.2d at 659.

When the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial and summary judgment should be granted. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356.

### A. *Cross Motions for Summary Judgment*

Although both parties argue for summary judgment, that does not by itself indicate that there are no genuine issues of material fact; the court must rule on each motion separately in determining whether each judgment may be entered in accordance with applicable principles. *ITT Indus. Credit Co. v. D.S. America, Inc.,* 674 F.Supp. 1330, 1331 (N.D.Ill.1987) (Shadur, J.) *District 12, United Workers of Am. v. Peabody Coal, Co.,* 602 F.Supp. 240, 242 (S.D.Ill.1985). See C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2720 (2d ed. 1983 & Supp.1987). Cross-motions for summary judgment do not require the court to decide the case on those motions; the court can deny both motions if both parties have failed to meet the burden of establishing no genuine issue of material fact exists and that they are entitled to judgment as a matter of law. *ITT,* 674 F.Supp. at 1331; *Wolf v. Maryland Casualty,* 617 F.Supp. 456, 458 (S.D.Ill. 1985).

### B. *Partial Summary Judgment*

Rule 56(d), F.R.Civ.P., involves situations in which the motion does not lead to a judgment on the entire case but only terminates further contest on a portion of the litigation. Because Rule 56(d) is part of the rule entitled "Summary Judgment", the order prescribed by this rule has been referred to as "Partial Summary Judgment." C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2737 (2d ed. 1983 & Supp.1987). Partial Summary Judgment is not possible in federal pleading unless it disposes entirely of one or more of the counts of the complaint. *Biggins v. Olt-*

*mer Iron Works,* 154 F.2d 214, 216 (7th Cir.1946); *Capitol Records, Inc. v. Progress Record Distrib.,* 106 F.R.D. 25, 28 (N.D.Ill.1985) (Getzendanner, J.).

### V. DISCUSSION OF COUNTS I—IV

Preferential transfers can be avoided by the trustee under § 547(b) of the Bankruptcy Code. The subsection provides as follows:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of *an interest of the debtor in property*—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

    (A) on or within 90 days before the date of the filing of the petition; or

    (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

    (A) the case were a case under chapter 7 of this title;

    (B) the transfer had not been made; and

    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

(Emphasis supplied.)

SunarHauserman argues that the joint checks never became "an interest of the debtor in property," and therefore there was no preferential transfer. It points to authority holding that when funds are transferred from a third party to a creditor of a debtor, courts focus on the degree of control the debtor had over the transferred funds to determine if the funds were property of the debtor's estate. If the debtor had no control over the disposition of the funds that were transferred, no preference occurs because the debtor never had a sufficient interest in the funds for them to

become property of the debtor. SunarHauserman contends that Network 90° had no control whatsoever over the joint checks because the customers gave those checks directly to SunarHauserman, who endorsed and deposited them. SunarHauserman further argues that the lack of physical control is an indication that the debtor lacked "an interest" in the check funds. SunarHauserman contends that Debtor relinquished any right to determine which creditors should receive the proceeds of the joint checks when it entered into the Agreement since SunarHauserman was the only creditor to be paid by joint checks issued by customers. Under the Expanded Agreement, which gave SunarHauserman the power of attorney to endorse checks on the Debtor's behalf, SunarHauserman urges that Debtor clearly lacked control over the joint checks. SunarHauserman's Memorandum in Opposition to Network 90°'s Motion for Summary Judgment (Def. Memo in Opposition to S.J.) at 5–7, SunarHauserman's Memorandum in Opposition to Debtor's Amended Motion for Summary Judgment (Def. Memo in Opposition to Amended S.J.) at 8–12.

SunarHauserman also relies on the doctrine known as "earmarking" for the contention that the joint checks were not property of the debtor. Under that doctrine, SunarHauserman contends that when a third party provides funds to a creditor by "earmarking" them (i.e. designating the creditor to receive the funds), and the debtor has no say as to which creditor is paid, no preferential transfer occurs because the funds never become part of the estate. Def. Memo in Opposition to S.J., at 7–8.

The Defendant contends that there are several different ways for a creditor to "earmark" a payment so that it never becomes part of the estate. First, the third party could loan the debtor money with the understanding that the loan proceeds may be used only to pay a certain creditor. Second, that party could, as in this case, issue a check payable to the debtor and a creditor. SunarHauserman suggests that the use of joint checks, and Debtor's grant

to it of a power of attorney, demonstrates that Debtor as well as its customers intended that the customers' money go to SunarHauserman. Therefore, Defendant contends under the "earmarking" doctrine that the checks never became part of the Debtor's estate. Even if joint checks had not been used, SunarHauserman urges that the checks still would not have become property of the Debtor because there was an agreement between the customers, the Debtor, and itself that the checks would be used to pay SunarHauserman. Def. Memo in Opposition to S.J., at 8–12.

The Trustee argues in response that the joint checks were property of the Estate since Debtor had an interest in the checks and the Estate was diminished by the transfer. Throughout each joint check transaction, Trustee contends that the Debtor maintained legal title to those checks as well as equitable title. The equitable interest amounted to a 22% equity interest in each joint check delivered directly to Defendant—the difference between Defendant's invoice to the Debtor and the amount of the joint check. Trustee claims that upon endorsement of a check SunarHauserman would deposit the check and remit the difference between Defendant's invoice to Debtor, and Debtor's invoice to its customers, directly to Debtor. This amount was usually about 22%. The Trustee also argues that once the Expanded Agreement was in place the Defendant never performed its remittance obligation. Further, it is suggested that Debtor did not waive any rights to the 22% commission and nothing in either of the agreements between Debtor and Defendant excused Defendant from performing its pre-existing duty to remit to Debtor the difference between invoice amount and check amount. Trustee contends that all the remittances of about 22% of the checks that were due the Debtor upon the transactions should have amounted to more than $160,000. Plaintiff's Memorandum in Response to Defendant's Cross-Motion (Pl. Memo in Response to Cross-Motion), at 3–5; Plaintiff's Reply Memorandum on Cross-Motions (Pl.

Reply Memo on Cross–Motions), at 3.[2] Trustee's Amended Motion for S.J., ¶ 16, 31.

In response, SunarHauserman contends based on the uncontroverted facts that, "[B]y the time the six transactions that are the subject of this adversary proceeding took place, the Agreements were in effect, and any prior practice whereby SunarHauserman remitted any monies to Network 90° had ceased." Def. Memo in Opposition to Amended S.J., at 7.

Additionally, the Trustee contends that the facts of this case do not give rise to an earmarking situation. According to the Trustee, this is no proof to fulfill the requirement that the customers intended their money to go to SunarHauserman. The Trustee asserts that the Court must look to the source of control over disposition of the funds to determine whether the payment is a voidable preference or is covered by the earmarking doctrine. In the instant case, Trustee maintains that Debtor specifically controlled the disposition of the funds by entering into the agreements with the Defendant; but for those agreements, Defendant would not have been entitled to or received the funds at issue from the customers. Pl. Memo in Response to Cross–Motion, at 5–8.

In *Coral Petroleum, Inc. v. Banque Paribas–London,* 797 F.2d 1351 (5th Cir.) *reh'g denied* 801 F.2d 398 (1986), the court dealt with many of the same issues presented here. Coral received a $35,000,-000 term loan from Paribas–Suisse, which Coral could prepay without penalty. To avoid being charged with certain interbank taxes and charges, interbank arrangements were made for the funds to be provided to Coral from Paribas–London as agent for Paribas–Suisse. Leeward, an indirect subsidiary of Coral, deposited $35,000,000 with Paribas–Suisse to serve as pledged collateral for Paribas–Suisse's loan to Coral. A pledge agreement was then signed by Leeward and Paribas–Suisse that gave Paribas–Suisse a right of pledge and offset on any Leeward deposit against any claims Paribas–Suisse might have against Coral.

Coral decided to prepay the loan and informed Leeward of its intentions. The repayment occurred after several telexes were sent to Paribas–Suisse in which:

1. Leeward directed Paribas–Suisse to transfer the $35,000,000 balance in the London fiduciary account in Paribas–Suisse's name to Leeward's account at Paribas–Suisse in Geneva;

2. Leeward directed Paribas–Suisse that $35,000,000 be transferred from the Leeward account at Paribas–Suisse in Geneva to the Coral account at Paribas–Suisse in Geneva; and

3. Coral directed Paribas–Suisse that the $35,000,000 expected to be credited to its account at Paribas–Suisse in Geneva was to be applied by Paribas–Suisse in Geneva to repayment of Coral's loan debt to it.

*Coral,* 797 F.2d at 1358.

The Creditors' Committee in the *Coral* case brought a voidable preference suit to avoid the transfer from Coral's account to Paribas–Suisse. The Fifth Circuit found that the key to resolution of the dispute centered on whether Coral had any control of the Leeward collateral during the repayment of Coral's loan. The Committee claimed that there was at least one "magic moment" when Coral had general control over the funds. However, the Court found that there was no such moment. Once the Leeward collateral was placed in possession of Paribas–Suisse, neither Coral nor Leeward was found to have any control over the funds. Thus, the court found that the Leeward collateral was at all times restricted for the security and the eventual repayment of Coral's loan. Furthermore, the court found that Paribas–Suisse had maintained full control over the collateral and excluded any control whatsoever of the funds by Coral.

The Committee contended that Leeward's collateral was placed into Coral's account without restrictions being placed on Coral's use of the funds, and therefore Coral had some form of control over the

---

**2.** The Trustee's Amended Motion for S.J. sets this figure at a much higher amount.

funds. The court found, however, that Leeward's intent was not dispositive of whether there were restrictions on the funds. The court noted that there are cases where the third party's intent is dispositive on that issue, e.g. where the debtor physically receives the money from the third party and the only source of restriction is the third party's intent. Since Coral never had access to these funds because of the simultaneous bookkeeping transaction, the court found that Leeward's intent was not the only source of the restriction on Coral's use of the funds. Thus, the necessity of proving the third party's intent was much less compelling. The court found that no preference existed because of the crucial fact that Coral did not control the money to the extent that it became property of its estate. The *Coral* court also noted that in a situation where a debtor never physically controls or owns the disputed funds, a preference is much less likely to arise. *Coral*, 797 F.2d at 1361–62.

In the case of *In re Hartley*, 825 F.2d 1067 (6th Cir.1987), the court examined the debtor's control of a transaction in determining whether a preference had taken place. The alleged preference amounted to the debtor granting a security interest to a third party in exchange for the third party paying a portion of the debtor's overdraft at Peoples Banking Company. The court found a preference equal to the amount of the security interest given, because that was the extent to which the transaction depleted the debtor's estate. The court relied on what it believed was the rationale in a similarly decided case:

> We think, however, that the court [in the other cited case] reasoned that the loan presumably would not have been made but for the debtor's transfer of a security interest to the third party. Thus, the debtor controlled the loan to the extent he gave security for it. Consequently, [that] court held, the transfer of the proceeds was a voidable preference to the extent of the debtor's control, the value of the security.

*In re Hartley*, 825 F.2d at 1071. In response to the argument that the debtor in *Hartley* would be able to prefer one creditor over another, the court found that to prevent such an abuse a court may ascertain that the new lender, not the debtor, earmarked the funds for the particular creditor.

Although relying on the extent of the depletion of the estate, the court in *In re Belme*, 79 B.R. 355 (Bankr.S.D. Ohio 1987) reached the same conclusion as that reached in *Hartley*. The debtors had obtained a loan from a third party and used their personal property as collateral for the loan. Some if not all of the personal property was already subject to a security agreement with the third party. A portion of the loan was obtained for the express purpose of satisfying debtors' indebtedness to defendant, and a check was issued payable to the debtor and the defendant for that amount. The debtors endorsed the check and the defendant received the proceeds. The debtor filed bankruptcy less than ninety days later, and the trustee sought to recover the payment to the defendant. The court found that the trustee had not proven that there had been a transfer of debtor's property. That is, the trustee had not shown that debtor had transferred any unencumbered assets to the third party in exchange for the loan at issue. Thus, trustee had not shown that the transfer had depleted the debtors' estate.

*In re Bohlen Enterprises*, 859 F.2d 561 (8th Cir.1988), the court identified three requirements before a transaction may qualify under the earmarking doctrine:

1. the existence of an agreement [3] between the new lender and the debtor that the new funds will be used to pay a specified antecedent debt;

2. performance of that agreement according to its terms; and

3. the transaction viewed as a whole (including the transfer in of the new funds and the transfer out to the old creditor) does not result in any diminution of the estate.

---

3. However, where a guarantor pays the old creditor directly, the requirement of an agree-

ment between the new lender-guarantor and the debtor was found to be inapplicable.

*Bohlen,* 859 F.2d at 566. Alternatively, the *Bohlen* court noted that a control test—whether the debtor had "control" over the funds provided by the new lender—is often invoked.

■ In light of the foregoing authority, whether or not a transfer amounts to a preference largely depends on whether debtor had control over the property that was transferred, and also on whether the transfer depleted the estate.

Control or lack therefor over the subject property may be demonstrated in different ways:

1. The debtor lacks control if he had no control of the third party's collateral during the payment by a third party to the creditor, i.e. the funds were restricted for payment to the creditor. *Coral.*

2. The debtor is not likely to have had control of the funds if the debtor have had physical control of the funds. *Coral.*

3. The debtor controls the third party's transfer to the extent the debtor gives value to the third party. *Hartley.*

Diminution of the estate is often determined by the amount of unencumbered assets that debtor transfers to the third party. *Belme.*

If the debtor had control over transfers from a third party, or if there was a diminution in the estate, then there has been a preferential transfer because the debtor has in effect determined that one creditor will receive a greater payment than another.

■ In the instant case, from the undisputed facts it is clear that Debtor reached an agreement with SunarHauserman, prior to the ninety day preference period under 11 U.S.C. § 547(b)(4)(A), that (1) SunarHauserman would receive all joint checks from Network 90° customers, and (2) all checks would be applied to Network 90°'s current and past due obligations.[4] That agreement and the mechanics of its enforcement deprived Debtor of any control over the joint checks as effectively as an agreement would have if between the customers and SunarHauserman, or between the customers and Network 90°. The lack of control by the Debtor was demonstrated by the fact that joint checks were sent directly to SunarHauserman. Therefore, the Debtor did not have any control of the joint checks so as to support the contention that they became property of the Debtor.

Despite Trustee's argument that Debtor never relinquished its right to the approximate 22% in difference between invoices and checks paid, the express terms of the Expanded Agreement gave SunarHauserman the right to apply the full amount of the joint checks to both current and past due invoices. Debtor thus effectively relinquished the 22% portion as well as the rest of each check.[5]

Each customer who paid SunarHauserman by joint check did receive a product from the Debtor, and thus there appears to have been a diminution in the Estate as each product was shipped. However, from and after July of 1986, SunarHauserman

---

**4.** The Expanded Agreement was reached because SunarHauserman refused to fill an order Network 90° placed on July 29, 1986. Therefore, this order and all subsequent orders were covered by the Expanded Agreement. It is less clear whether the joint check at issue in Count IV is covered by the Expanded Agreement since Network 90° placed the order with SunarHauserman before July 29, 1986. However, the original Agreement was in place at the time of the Count IV order. Under the original Agreement SunarHauserman was to received all joint checks from Network 90° customers and according to the Debtor SunarHauserman had the powers to apply the proceeds of each check to pay current obligations and past due obli-

gations. Plaintiff's Statement of Facts, ¶ 6. Therefore it is undisputed that the joint check involved in each count was subject to an agreement that (1) SunarHauserman would receive all joint checks from Network 90° customers, and (2) all checks would be applied to Network 90°'s current and past due obligations.

**5.** In Plaintiff's Statement of Facts, ¶ 6, he stated that the original Agreement gave SunarHauserman the power to apply the proceeds of each check to pay current obligations and past due obligations. Therefore, there is no issue as to whether the Debtor had a 22% equity interest in the check at issue in Count IV.

would not have dealt with Network 90° had it not been for the terms of the Expanded Agreement. Therefore, the Debtor would not have had a product to sell were it not for the Expanded Agreement. Before that date, there would not have been a Sunar-Hauserman product to sell had it not been for the original Agreement. In the sense that the entire process first provided product and then provided for its sale, the delivery of the product completed a process that did not in fact diminish the estate of Debtor.

The Trustee relies on *In re Villars*, 35 B.R. 868 (Bankr.S.D. Ohio 1983), cited in *In re Hartley*, 825 F.2d at 1071–1072, for the contention that the earmark rule requires that the party making the loan choose the recipient of the funds. In *Villars*, the debtors had a line of credit with a third party secured by an open-end junior mortgage lien on their real estate and security interests in farm chattels and crops. The debtor owed money to the defendant corporation. The corporation contacted the third party about debtors' account and induced the issuance of a check for payment of the outstanding account in full. The third party issued a check (within the preference period) jointly payable to the defendant and the debtor. The debtor endorsed the check, and the funds were deposited in the bank account of the defendant. The court found that the proceeds of the line of credit were estate property, and a preference had occurred. The court stated:

> If the Debtor did not choose to increase his secured loan, to pay the defendant, he had the absolute control over these funds in the sense that the Defendant had no legal right to force him to make an endorsement.

*Villars*, 35 B.R. at 872. The court never stated what earmarking required; rather the court stated that whether or not there was some type of "earmarking" was not in issue in view of the evidence.

In the instant case, the Defendant had a clear right under the Agreements to proceeds of the joint checks. Trustee concedes that the Defendant had such a right. However, the Trustee contends that Debtor controlled the funds by entering into the Agreements which gave this right over to Defendant. The Trustee cites in support of that argument *In re Howdeshell of Ft. Myers*, 55 B.R. 470, 474 (Bankr.M.D.Fla. 1985), where the court stated:

> If the Debtor determines the disposition of the funds and designated the creditor to whom payment is made, it is clear that the funds are available for payment to creditors in general, and the funds are an asset of the estate.

Although Debtor did choose to give control of the joint checks to SunarHauserman, such control was given up long before the 90–day preference period under § 547(b)(4)(A) and therefore does not give rise to avoidance rights.

Defendant's theory of recovery under the doctrine of recoupment need not be addressed since Defendant prevails for reasons set forth hereinabove.

Defendant's Motion for Summary Judgement upon Counts I, II, III, IV is granted, and the Trustee's Cross Motions for Summary Judgement and Partial Summary Judgement as to those Counts is denied.

## VI. DISCUSSION OF COUNTS V & VI

Section 549 of Title 11 U.S.C. gives Trustee the power to avoid certain postpetition transfers. Subsection (a) is the portion relevant here:

(a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate-

(1) that occurs after the commencement of the case; and

(2)(A) that is authorized only under section 303(f) or 542(c) of this title; or

(B) that is not authorized under this title or by the court.

SunarHauserman and the Trustee rely on the same arguments for Counts V and VI as each raised with regards to Counts I through IV. SunarHauserman argues that the proceeds of the joint checks at issue in Counts V and VI were never property of the Debtor's estate, and therefore may not be recovered under § 549. The Trustee argues that the joint checks were property

of the Estate since the Debtor had an interest in the checks and the Estate was diminished by the transfer.

In determining whether the two joint checks which relate to Counts V and VI were property of the Estate, this Court's analysis of Counts I through IV is relevant. While precedent does not clearly show that the earmarking rationale applies to postpetition transfers as well as prepetition transfers, the doctrine logically applies.

*In re Page,* 18 B.R. 713 (D.D.C.1982), involved a postpetition transfer with a discussion of whether estate property was at issue. At the time of bankruptcy filing, Westinghouse Credit Corporation held a $500,000 letter of credit, running in its favor, issued by the First National Bank of Maryland. As a condition of issuing the letter of credit the bank had required the debtors, Mrs. Page and Page Associates, to indemnify the bank in the event Westinghouse drew on the letter of credit. Security was pledged for their indemnification. After Chapter 11 petitions were filed, Westinghouse presented the letter of credit to the bank for payment. The debtors sought to enjoin payment on the letter of credit. The court determined that the letter of credit was not property of the estate nor were its proceeds. Thus, the court determined that drawing against the letter of credit was not the type of "act" contemplated by the automatic stay provisions of the Bankruptcy Code:

> Section 421 of 11 U.S.C defines property of the estate as "all legal or equitable interests of the debtor" (subject to various limitation not relevant in this case). In issuing the letter of credit the Bank entered into an independent contractual obligation to pay WCC out of its assets. Although cashing the letter will immediately give rise to a claim by the Bank against the debtors pursuant to the latter's indemnification obligations, that claim will not divest the debtors of any property since any attempt to enforce that claim would be subject to an automatic stay pursuant to 11 U.S.C. § 362a(4). (footnote omitted)

*Page,* 18 B.R. at 715–16.

The court also found that cashing of the letter of credit would not violate § 549 since there was no transfer of property of the debtor. It was held in *Page* that the letter of credit and its proceeds represented property of the Bank, not that of the debtors.

■ In the instant case the customers had no independent obligation to SunarHauserman. However, Network 90° did have an obligation to SunarHauserman to see that customer joint checks were forwarded to SunarHauserman to be applied against the Network 90° indebtedness. This obligation was entered into by Network 90° prepetition. Thus, Network 90° had given up control of the property prepetition and did not make a "transfer" of "property of the estate" postpetition as required under § 549. See *Howdeshell,* 55 B.R. at 474. Therefore, the joint checks at issue in Counts V and VI were not Estate property transferred after commencement of the related bankruptcy case. Summary Judgment is granted to SunarHauserman as to Counts V and VI, and is denied to the Trustee.

## VII. DISCUSSION OF COUNT VII

Count VII alleges that SunarHauserman may have cashed and retained the proceeds of other jointly payable checks. SunarHauserman denies receiving any such proceeds. SunarHauserman's affidavit of denial (Cebula aff. ¶ 24–25) is uncontradicted. In light of this Court's finding that the joint checks at issue in Counts I through VI were not Estate property, if any additional joint checks had in fact been received by SunarHauserman they too would likely not have been Estate property. However, since no such additional checks were received we need go no further. Therefore, Summary Judgment is granted in favor of SunarHauserman as to Count VII and against the Trustee.

## VIII. CONCLUSION

Summary Judgment is granted in favor of Defendant SunarHauserman on all Counts of the Complaint. Summary Judgment is denied to Trustee on Counts III, V,

and VI. Partial Summary Judgment is denied to Trustee on Counts I, II and IV. By separate order, judgment will be entered accordingly.