**In re NETWORK 90°, INC., Debtor.**

**David R. HERZOG, as Trustee of the Estate of Network 90°, Inc., Plaintiff–Appellant,**

v.

**SUNARHAUSERMAN, Defendant–Appellee.**

Bankruptcy No. 89 C 2850.
Adv. No. 87 A 421.

United States District Court, N.D. Illinois, E.D.

April 17, 1991.

transfers to SunarHauserman. 98 B.R. 821 (Bankr.N.D.Ill.1989).[1] The Bankruptcy Court concluded that the debtor had no control over the six checks at issue in this proceeding, which were made payable jointly to Network 90°, Inc. ("Network 90°") and SunarHauserman and that consequently the checks were not property of the estate subject to the provisions of 11 U.S.C. §§ 547(b) and 549(a). 98 B.R. at 835–37. For the reasons set forth below, the Court affirms the decision of the Bankruptcy Court.

## II. FACTS

The facts underlying this appeal are undisputed and set forth in complete detail in the Bankruptcy Court's thorough opinion. *See* 98 B.R. at 822–30. A brief summary will suffice here.

Network 90° is a full service contract dealer in office furnishings and equipment. It is incorporated in Illinois and based in Chicago. SunarHauserman is an Ohio corporation which manufactures office furnishings, textiles, and movable walls.

Norman B. Newman, Much, Shelist, Freed, Denenberg, Ament & Eiger, Joseph L. Matz, Karla A. Kraus, Jeffrey H. Hornstein, Holleb & Coff, Victoria M. Rafols-Brown, William J. Harte, Ltd., Chicago, Ill., for plaintiff.

Robert R. Watson, Kate Paverman, Sidley & Austin, Chicago, Ill., for defendant.

### MEMORANDUM OPINION AND ORDER

ROVNER, District Judge.

### I. INTRODUCTION

Plaintiff-appellant David R. Herzog, as Trustee of the estate of debtor Network 90°, Inc. (the "Trustee"), has appealed from an order of the Bankruptcy Court entering summary judgment in favor of the defendant-appellant SunarHauserman upon all counts of the Trustee's complaint seeking to avoid certain prepetition and postpetition

In March of 1985, SunarHauserman became a supplier to Network 90°. In July of 1985, Network 90° and SunarHauserman reached an oral agreement which provided that (1) Network 90° would instruct its customers to render payment by means of checks made payable jointly to Network 90° and SunarHauserman, (2) Network 90° customers would send the checks either to SunarHauserman, which would forward them to Network 90° for purposes of endorsement and await their return, or in the alternative directly to Network 90°, which would then endorse the checks and send them on to SunarHauserman; and (3) SunarHauserman would add its endorsement to all checks, deposit them, apply the majority of the proceeds to the debt owing on past and current invoices, and remit the remainder (approximately 22 percent) to Network 90°.

1. This appeal was filed on April 7, 1989; however, the appeal was subsequently dismissed after SunarHauserman itself entered bankruptcy. The appeal was reinstated by motion of the Trustee on July 24, 1990 after relief from the automatic stay as to this appeal was obtained from the bankruptcy court presiding over SunarHauserman's bankruptcy.

Despite this agreement, Network 90°'s debt to SunarHauserman continued to mount as the result of orders which were not paid with joint checks from customers, and in July of 1986, SunarHauserman refused to fill an order from Network 90°. In order to induce SunarHauserman to continue supplying its products, Network 90° consented to an expanded oral agreement which provided that (1) Network 90° would forward all checks from its customers to SunarHauserman without endorsement, (2) Network 90° would grant to SunarHauserman a power of attorney to endorse all checks made payable jointly to both Network 90° and SunarHauserman, and (3) SunarHauserman would endorse the checks and apply the proceeds to Network 90°'s current and past due obligations.[2]

Network 90° filed a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code on March 13, 1987. In the 90-day period prior to that filing, SunarHauserman negotiated four checks totalling $408,825.44 from Network 90° customers which were made payable jointly to Network 90° and SunarHauserman pursuant to the terms of the expanded agreement. In the weeks following Network 90°'s Chapter 11 filing, SunarHauserman negotiated two additional joint checks totalling $207,955.89 which were written on or after the filing date.

Network 90° filed a complaint against SunarHauserman in the Bankruptcy Court seeking to avoid the transfer of each of these six checks to SunarHauserman. Network 90° contended that SunarHauserman's negotiation of the four checks during the 90-day period prior to the bankruptcy amounted to preferential transfers which should be voided pursuant to § 547(b) of the Bankruptcy Code. It contended that negotiation of the remaining two checks amounted to postpetition transfers which should be voided under § 549(a) of the Bankruptcy Code. Network 90° subsequently moved for summary judgment on two counts of its complaint, and SunarHauserman filed a cross-motion for summary judgment on all counts of the complaint. When the case was later converted to a Chapter 7 proceeding, the Trustee was permitted to substitute himself as the plaintiff and adopt Network 90°'s complaint. The Trustee then filed an amended motion for summary judgment, seeking summary judgment on certain counts, and partial summary judgment on others.

The Bankruptcy Court denied the Trustee's amended motion and granted SunarHauserman's motion for summary judgment on all counts of the complaint. SunarHauserman contended that none of the checks in question constituted property of the estate for purposes of §§ 547(b) and 549(a), because by the terms of the expanded oral agreement between Network 90° and SunarHauserman, the checks had been "earmarked" for SunarHauserman. Accordingly, in SunarHauserman's view, negotiation of these checks did not qualify as preferential or postpetition transfers which could be avoided by the Trustee. *See* 98 B.R. at 832–33. The Bankruptcy Court agreed. Having reviewed the relevant authorities, it concluded that the key questions to be considered in determining whether or not the transfer of the payments to SunarHauserman could be avoided were whether Network 90° had control over the checks and whether transfer of these checks to SunarHauserman depleted the estate. *Id.* at 835.[3] The Bankruptcy

---

**2.** The expanded agreement between Network 90° and SunarHauserman apparently made no provision with respect to the 22 percent markup over invoice price which SunarHauserman had formerly remitted to Network 90° under the original agreement. The Trustee maintained before the Bankruptcy Court that SunarHauserman remained obligated under the expanded agreement to remit this amount to Network 90°, but the Bankruptcy Court rejected that argument, reasoning that the express terms of the expanded agreement permitted SunarHauserman to retain and apply all proceeds of the joint checks. 98 B.R. at 835. *See* page 993, *infra.* The Trustee does not challenge this conclusion on appeal.

**3.** Although the Bankruptcy Court considered the prepetition and postpetition transfers separately, it applied essentially the same reasoning to each. *See* 98 B.R. at 837 ("While precedent does not clearly show that the earmarking rationale applies to postpetition transfers as well as prepetition transfers, the doctrine logically applies.").

Court answered both of these inquiries in the negative.

Based upon the terms of the expanded oral agreement between the parties, the Bankruptcy Court found that Network 90° lacked control over the checks in question:

> In the instant case, from the undisputed facts it is clear that Debtor reached an agreement with SunarHauserman, prior to the ninety day preference period under 11 U.S.C. § 547(b)(4)(A), that (1) SunarHauserman would receive all joint checks from Network 90° customers, and (2) all checks would be applied to Network 90°'s current and past due obligations. That agreement and the mechanics of its enforcement deprived Debtor of any control over the joint checks as effectively as an agreement would have if between the customers and SunarHauserman, or between the customers and Network 90°. The lack of control by the Debtor was demonstrated by the fact that joint checks were sent directly to SunarHauserman. Therefore, the Debtor did not have any control of the joint checks so as to support the contention that they became property of the Debtor.

98 B.R. at 835. The Bankruptcy Court also rejected Network 90°'s contention that its agreement to have the joint checks turned over directly to SunarHauserman reflected the requisite control over these funds:

> Although Debtor did choose to give control of the joint checks to SunarHauserman, such control was given up long before the 90–day preference period under § 547(b)(4)(A) and therefore does not give rise to avoidance rights.

*Id.* at 836.

The Bankruptcy Court further determined that SunarHauserman's negotiation of the checks did not diminish the estate. It initially disposed of the Trustee's contention that by retaining the full amount of the checks in question, SunarHauserman deprived Network 90° of the 22 percent of check proceeds it had formerly remitted to Network 90° under the parties' original agreement:

> Despite Trustee's argument that Debtor never relinquished its right to the approximate 22% in difference between invoices and checks paid, the express terms of the Expanded Agreement gave SunarHauserman the right to apply the full amount of the joint checks to both current and past due invoices. Debtor thus effectively relinquished the 22% portion as well as the rest of each check.

98 B.R. at 835 (footnote omitted). Although the Bankruptcy Court recognized that this arrangement effectively left Network 90° to supply products to its customers without compensation, it did not find this situation to represent a diminution of the estate which could be avoided:

> [F]rom and after July of 1986, SunarHauserman would not have dealt with Network 90° had it not been for the terms of the Expanded Agreement. Therefore, the Debtor would not have had a product to sell were it not for the Expanded Agreement. Before that date, there would not have been a SunarHauserman product to sell had it not been for the original Agreement. In the sense that the entire process first provided product and then provided for its sale, the delivery of the product completed a process that did not in fact diminish the estate of the Debtor.

*Id.* at 835–36. Having determined that Network 90° did not have any control over disposition of the six checks and that transfer of these checks to SunarHauserman did not diminish the estate, the Bankruptcy Court concluded that there was no prepetition or postpetition transfer which could be avoided under §§ 547(b) or 549(a). 98 B.R. at 835–37.

The Trustee appeals from this ruling, contending that the earmarking doctrine does not support the Bankruptcy Court's decision.

### III. ANALYSIS

The Trustee contends that the Bankruptcy Court erred in finding that the earmarking doctrine constituted a valid defense to his preference and postpetition transfer claims under the facts of this case. According to the Trustee, the earmarking doctrine properly may be invoked only

when a new creditor supplies funds for the purpose of paying off an existing creditor, and the new creditor either transfers the funds directly to the old creditor or entrusts them to the debtor on the understanding that the debtor will apply them to the existing debt. Because there was no new creditor in this case, and the funds transferred to SunarHauserman came from Network 90°'s customers, the Trustee argues that Network 90° controlled and owned those funds, such that the transfer of them to SunarHauserman diminished the estate for purposes of §§ 547 and 549.

The Trustee is correct in contending that the circumstances which normally call for invocation of the earmarking doctrine are missing from this case. Here, in contrast to the traditional earmarking case, there is no third party which loaned funds to Network 90° for the purpose of reducing Network 90°'s debt to SunarHauserman. Instead, the payments transferred to SunarHauserman were made by Network 90°'s customers. Thus, this case does not reflect the usual scenario underlying the earmarking doctrine, substitution of one creditor for another. The customers of Network 90° did not become new creditors of the company (although, as the Bankruptcy Court recognized, Network 90° was obligated to provide products to the customers in exchange for the payments received). Moreover, although these customers evidently were instructed to make their checks payable jointly to Network 90° and SunarHauserman and likely realized as a result that the payments might be handed over to SunarHauserman, presumably the customers had no concern over who actually cashed the checks and retained the funds.

Nonetheless, the Bankruptcy Court was correct in concluding that the earmarking doctrine does not necessarily require that there be a new creditor which supplies money to pay off a debt to an existing creditor. The foundation of the earmarking doctrine lies not in the relationship of the old and new creditors and the debtor, but in the debtor's control (or lack of control) over the assets which were transferred. *Coral Petroleum, Inc. v. Banque Paribas–London,* 797 F.2d 1351, 1361 (5th Cir.1986), illustrates the point. In *Coral,* the debtor had obtained a substantial loan from a Swiss bank. In exchange for the loan, the debtor arranged for one of its indirect subsidiaries to deposit a sum equal to the amount of the loan with the bank as pledged collateral; the bank in turn placed the collateral with its London affiliate. Subsequently, the debtor decided to prepay the loan in full. In order to accomplish the repayment, the debtor's subsidiary instructed the bank to transfer the deposited collateral from the bank's London affiliate to the bank and then to the debtor's general account at the bank. The debtor in turn instructed the bank to apply the forthcoming deposit into the debtor's account to the debtor's outstanding obligation on the loan. Several weeks after this occurred, the debtor filed for bankruptcy under Chapter 11, and a committee appointed to represent the interests of unsecured creditors sought to avoid repayment of the loan under § 547. The committee filed a preference claim with the district court, and that court dismissed the claim, relying in part upon the earmarking doctrine. The committee appealed, contending that when the pledged collateral was momentarily placed in the debtor's account with the bank prior to it being transferred to the bank as repayment of the loan, the debtor had control over the money and could theoretically have used it to pay creditors other than the bank, thus rendering payment to the bank a preference for purposes of § 547.

The Fifth Circuit rejected that argument, reasoning that although the money may have rested briefly in the debtor's account, the funds had never been truly at the debtor's disposal. 797 F.2d at 1359–60. Rather, "from the very inception of the loan," when the collateral had been turned over to the bank, neither the debtor nor its subsidiary had enjoyed any control over the funds. *Id.* Although the bank did transfer the collateral into the debtor's general account with the bank, it did so only for the purpose of effectuating repayment of the loan. *Id.* at 1360. Nonetheless, the committee argued that the earmarking doctrine did

not apply, because any restrictions on the use of the collateral came from the bank itself, rather than a third party like the debtor's subsidiary. The court rejected that argument as well, reasoning that while proof of a third party's intent to restrict use of the funds is one way to establish earmarking, such proof was not required, "especially if there is adequate proof of the lack of control by a debtor." *Id.* at 1361.

*Coral* makes clear that in order to be deemed earmarked, the funds need not have been restricted by a third party lender as is normally the case; rather, what is dispositive of the earmarking determination is whether or not the debtor had control over the funds. *See* 797 F.2d at 1362 ("to look at the identity of the actual earmarker is to lose sight of the fact that whoever it was, it was not [the debtor]"); *see also In re Hartley*, 825 F.2d 1067, 1070 (6th Cir.1987) ("the diminution of the estate doctrine asks whether the debtor controlled the property to the extent that he owned it and thus the transfer diminished his estate"). *Cf. In re Bohlen Enterprises, Ltd.*, 859 F.2d 561, 566, 567 (8th Cir.1988) (although the court formulated the earmarking test so as to require an explicit agreement between a new lender and an existing creditor specifying use of the loan to satisfy the existing debt, the court also acknowledged and applied the alternate "control" test employed by other courts). As in *Coral*, control over disposition of the funds at issue rested with the existing creditor. By virtue of the expanded agreement between SunarHauserman and Network 90°, all payments to Network 90° were made jointly payable to it and to SunarHauserman, the payments were forwarded directly to SunarHauserman, SunarHauserman endorsed and negotiated the checks using the power of attorney given it by Network 90°, and SunarHauserman disposed of the proceeds. Thus, even though the payments submitted by Network 90°'s customers were nominally payments to Network 90°, the expanded agreement between Network 90° and SunarHauserman deprived Network 90° of any control over these payments. Accordingly, the payments were not property of the estate and transfer of them to SunarHauserman did not diminish the estate for purposes of §§ 547 or 549.

The Court recognizes that this result is contrary to the holding of *In re Funding Systems Asset Management Corp.*, 111 B.R. 500, 514–515 (Bankr.W.D.Pa.1990). In that case, the bankruptcy court concluded that lease payments which a creditor, under the terms of a prior agreement between that creditor and the debtor, received directly from the user-lessees of computer equipment leased from the debtor were not exempt from the provisions of § 547 by virtue of the earmarking doctrine. *Id.* The court reasoned that the earmarking doctrine was inapplicable because the payments submitted by the user-lessees were not loans and the user-lessees were not creditors. *Id.* at 514. The court further reasoned that although the payments in question were made directly to the creditor, they were payments which were owed to the debtor, and consequently the transfer of these payments to the creditor depleted the estate. *Id.* at 514–15.[4]

---

**4.** The same bankruptcy court reached a comparable conclusion in *In re Buono*, 119 B.R. 498 (Bankr.W.D.Pa.1990). As in this case, the debtor in *Buono* had agreed with one of its suppliers that subsequent payments to the debtor would be made payable jointly to the debtor and the supplier, that the debtor would endorse the checks and forward them to the supplier, and that the supplier would negotiate the checks and return a percentage to the debtor. After the debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code, the Trustee sought to avoid the payments which the supplier had received under this agreement pursuant to § 547(b). The bankruptcy court concluded that the agreement between the debtor and its supplier constituted a preference which could be avoided. *Id.* at 501. However, in contrast to the expanded agreement in this case, the agreement under review in *Buono* was entered into *during* the 90-day preference period rather than before it. *See id.* n. 1 ("It is this feature, perhaps more than any other, that differentiates the present case from all of the cases cited by the parties. In all other cases, the Joint Check Agreement had been entered into more than ninety (90) days prior to the filing of the bankruptcy petition.") Thus, the debtor in *Buono* still had control of the payments it would receive at the beginning of the preference period,

■ This Court is not persuaded by the reasoning of *Funding Systems.* As set forth above, what is crucial to the finding of earmarking in these circumstances is not the presence of a new creditor which loans the debtor funds for the purpose of reducing an existing debt, but the debtor's lack of control over the funds received and forwarded to the existing creditor. By terms of the expanded oral agreement with SunarHauserman entered into prior to the 90–day preference period, Network 90° relinquished any control it might have had in the payments received from its customers. Accordingly, the payments governed by that agreement cannot be deemed property of the estate, nor can the estate be said to have been diminished by transfer of these payments to SunarHauserman.

■ That Network 90° chose to enter this arrangement with SunarHauserman does not alter the analysis, as Network 90° alternatively contends. Although Network 90° may have enjoyed some degree of prospective control over the funds at the time it consented to the expanded agreement with SunarHauserman, that point is irrelevant insofar as an assessment of Network 90°'s control when the funds were actually received at a later date. As the decision in *Coral* indicates, it is the debtor's control over the money at the time it is transferred which is crucial, not the control which the debtor may have enjoyed at a previous date when the terms of that transfer were arranged. *See* 797 F.2d at 1358 ("the key to the resolution of this dispute centers on whether [the debtor] had any control of the . . . collateral during the repayment of [the debtor's] loan when the preference allegedly occurred"); *id.* at 1359–60 ("from the very inception of the loan, once the . . . collateral was placed in [the bank's] hands, neither [the debtor] nor [its subsidiary] had any control over the funds whatever"). When it entered the expanded agreement with SunarHauserman, Network 90° relinquished all control over the future payments it would receive from its customers.

Thus, the Bankruptcy Court quite rightly concluded that at the point when these payments were actually transferred to SunarHauserman immediately before and after Network 90° filed its Chapter 11 petition, the payments were no longer within Network 90°'s control.

The correctness of this result, though it may not fit neatly within the usual earmarking scenario, is confirmed by reference to the central purpose of § 547—to discourage a "race to the courthouse" among the debtor's creditors in the short time period before bankruptcy and thereby to promote a more equitable distribution of the debtor's assets among all creditors. *See Coral,* 797 F.2d at 1355. In this case, neither Network 90° nor SunarHauserman contrived either during the 90–day preference period or subsequently to arrange transfer of the six payments in question; rather, the agreement pursuant to which those payments were forwarded to SunarHauserman was made well in advance of the preference period. Moreover, although avoiding transfer of these payments to SunarHauserman would no doubt make for a more substantial estate and thereby benefit Network 90°'s other creditors, the Bankruptcy Court's decision not to do so does not bestow an unfair advantage upon SunarHauserman vis a vis these other creditors. As the undisputed facts reveal, SunarHauserman would not have continued to supply Network 90° with goods to sell (and thus allow Network 90°'s debt to SunarHauserman to mount) without Network 90°'s agreement to effectively surrender complete control of all payments received from its customers to SunarHauserman. *Cf. Coral,* 797 F.2d at 1360 (citing evidence that the bank would not have released collateral into debtor's account for any reason other than to repay the loan as proof that the debtor lacked control over the collateral and that consequently, it was not property which belonged to the estate).

and its surrender of control consequently resulted in a diminution of the estate. In this case, however, Network 90° had relinquished its interest in the payments well before the preference period began; accordingly, the transfer of those payments to SunarHauserman did not dissipate the estate.

## IV. CONCLUSION

For the reasons set forth above, the Court affirms the decision of the Bankruptcy Court.