In re GRABILL CORP., Camdon Companies, Inc., Foxxford, Ltd., the Techna Group, Ltd., Windsor–Hamilton, Ltd., Debtors.

Jay A. STEINBERG, Plan Trustee for Grabill Corp., and Windsor–Hamilton, Ltd., Plaintiff,

v.

NCNB NATIONAL BANK OF NORTH CAROLINA, Defendant.

Bankruptcy Nos. 89 B 1639 to 89 B 1643. Adv. No. 90 A 0799.

United States Bankruptcy Court, N.D. Illinois, E.D.

Nov. 19, 1991.

---

Jay Steinberg, Hopkins & Sutter, Chicago, Ill., trustee.

Glen H. Kanwit, Hopkins & Sutter, Chicago, Ill., for trustee.

Steven B. Towbin, Towbin & Zazove, Ltd., Chicago, Ill., Robert D. Dearborn, Moore & Van Allen, Charlotte, N.C., for NCNB Nat. Bank of North Carolina.

M. Scott Michel, Chicago, Ill., U.S. Trustee.

## AMENDED MEMORANDUM OPINION

JOHN H. SQUIRES, Bankruptcy Judge.

This matter comes before the Court on the motion of NCNB National Bank of North Carolina ("NCNB") for partial summary judgment as to Count I of the complaint pursuant to Federal Rule of Civil Procedure 56 and Federal Rule of Bankruptcy Procedure 7056. For the reasons set forth herein, the Court having reviewed the pleadings, the exhibits attached thereto and the affidavits, hereby denies the motion. A material issue of fact remains unresolved by the submissions, namely whether the Debtor's estate was diminished by the transfer sought to be avoided and recovered as preferential pursuant to 11 U.S.C. §§ 547 and 550.

### I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this motion pursuant to 28 U.S.C. § 1334 and General Rule 2.33(a) of the United States District Court for the Northern District of Illinois. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F) and (O).

### II. UNDISPUTED FACTS

William J. Stoecker ("Stoecker") was the sole shareholder of the Grabill Corporation ("Grabill"). [Joint Pretrial Statement ¶ C.1(f)]. Grabill was a holding company which owned all of the stock of one of the Debtors, Windsor–Hamilton, Ltd. ("Wind-

sor"). [Joint Pretrial Statement ¶ C.1(g) ]. On or around November 1986, Windsor obtained a $20,000,000.000 line of credit from NCNB which was later increased to $25,-000,000. [Joint Pretrial Statement ¶ C.1(j) ]. As security for this line of credit, Windsor pledged and delivered to NCNB stock that Windsor owned in several subsidiaries. [Joint Pretrial Statement ¶ C.1(m) ]. The stock pledged included: J-L Industries, Ltd.; Veterans Supply Co., Inc.; Detroit Armor Corporation; and A Northstar Van and Storage, Inc. *Id.* As further security for the NCNB line of credit, Stoecker and each operating subsidiary guaranteed the line of credit. [Joint Pretrial Statement ¶ C.1(k) ]. By early May 1988, Windsor had used $13,177,250.00 of the available credit. [Joint Pretrial Statement ¶ C.1(r) ].

In May 1988, Grabill, Windsor, and the three other Grabill holding company subsidiaries (Camdon Companies, Inc.; Foxxford Group, Ltd.; and The Techna Group, Ltd.) (collectively referred to as the "Borrowers") entered into a $150,000,000.00 credit agreement ("New Loan") with The Connecticut Bank and Trust Company, N.A. ("CBT"), as the lead bank among a number of lenders, including: Harris Trust and Savings Bank; National Bank of Detroit; The Indiana National Bank; LaSalle National Bank; The Exchange National Bank of Chicago; Australia and New Zealand Banking Group, Limited (Chicago Branch); and Manufacturers National Bank of Detroit (collectively referred to as the "Lenders"). [Joint Pretrial Statement ¶ C.1(n.) ].

The proceeds of this New Loan were to pay the Borrowers' existing indebtedness listed on Schedule 7 of the New Loan documentation, as well as provide funds for general working capital purposes. [NCNB Exhibit No. C, p. 32, ¶ 5.01(a)–(c); *see* NCNB Exhibit No. B, p. 34]. Payment to the Schedule 7 creditors was to consume approximately $140,000,000.00 of the New Loan. [NCNB Exhibit No. D]. Windsor and the other Borrowers executed a note with joint and several liability in favor of each of the Lenders, in the aggregate amount of each Borrowers' revolving credit commitment. [NCNB Exhibit No. C,

¶ 3.01(f) and Exhibit A attached thereto]. Although the New Loan was otherwise unsecured, the Lenders did secure a negative covenant which prohibited the Borrowers from pledging their assets to other lenders. [NCNB Exhibit No. G, ¶ 16].

Among the numerous creditors to be paid from the New Loan proceeds was NCNB. Schedule 7 listed NCNB to receive $13,000,-000.00 of the New Loan proceeds. [NCNB Exhibit No. D]. Even though Schedule 7 began with NCNB, all creditors listed on said schedule were paid simultaneously at the closing of the New Loan. [NCNB Exhibit No. B, p. 34–36]. On May 6, 1988, CBT wired $13,177,250.00 to NCNB (the "Transfer") to satisfy Windsor's indebtedness owed to NCNB. [Joint Pretrial Statement ¶ C.1(r) ]. Upon payment, NCNB returned Windsor's stock held as security on the NCNB line of credit. [NCNB Exhibit No. I, ¶ 4].

Ms. Donna P. Alderman ("Alderman"), a loan officer with CBT testified that the purpose of the New Loan was to substitute the Borrowers' new Lenders for its old lenders. [NCNB Exhibit No. B, p. 57–58; *cf.* Windsor Exhibit No. M]. Alderman supervised the team formed to organize and structure the $150,000,000.00 credit agreement between the Lenders and Borrowers. [NCNB Exhibit No. B, p. 7–8]. In order to assure complete control over the funds and payment of existing indebtedness, Alderman testified that CBT wired the proceeds directly to the old lenders and not to the Borrowers. *Id.* Alderman qualified her testimony concerning the Borrowers' lack of control, however, by stating that CBT retained control over the funds simply because it was more efficient to have funds paid directly by CBT, rather than through the various Borrowers. [NCNB Exhibit No. B, p. 58]. Alderman analogized the position of CBT as that of an agent for the other Lenders to assure the recipients listed in the New Loan Schedule 7 were paid. *Id.* According to Alderman, the alleged agency relationship was not to safeguard the funds as much as it was to adhere to the New Loan agreement. [NCNB Exhibit

No. B, p. 60; *cf.* NCNB Exhibit No. C, p. 32, Article V].

Involuntary Chapter 7 petitions were filed against Grabill and Windsor on January 31, 1989. [Joint Pretrial Statement ¶ C.1(a)]. On February 3, 1989, the Debtors agreed to the entry for relief under Chapter 11 and the Court appointed Jay A. Steinberg as Chapter 11 trustee (the "Trustee"). [Joint Pretrial Statement ¶ C.1(b)]. On July 9, 1990, the Court confirmed a plan of liquidation for Grabill and Windsor. [Joint Pretrial Statement ¶ C.1(e)]. Under the plan, the Lenders compromised their collectively filed claims against Windsor's estate aggregating $150,000,000.00 downward to $15,674,-135.00. [NCNB Exhibit No. F].

On October 5, 1990, the Trustee filed the instant adversary proceeding, seeking in Count I, to avoid the $13,177,250.00 payment to NCNB under 11 U.S.C. § 547 as a preferential transfer. NCNB answered denying that the payment was a preference. The crux of NCNB's instant motion focuses on the interest, if any, Windsor had in the proceeds of the New Loan. Other causes of action alleged in Count II based upon 11 U.S.C. §§ 548 and 550, and Count III based upon 11 U.S.C. § 544, and the Illinois Fraudulent Conveyance Act involving a series of payments, are not involved in this motion.

## III. APPLICABLE STANDARDS

### A. *Summary Judgment*

In order to prevail on a motion for summary judgment, the movant must meet the statutory criteria set forth in Rule 56 of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056. Rule 56(c) reads in part:

> [T]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c); *see also Donald v. Polk County,* 836 F.2d 376, 378–379 (7th Cir. 1988).

In 1986, the Supreme Court decided a trilogy of cases which encourage the use of summary judgment as a means to dispose of factually unsupported claims. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The primary purpose for granting a summary judgment motion is to avoid unnecessary trials when there is no genuine issue of material fact in dispute." *Farries v. Stanadyne/Chicago Div.,* 832 F.2d 374, 378 (7th Cir.1987) (quoting *Wainwright Bank & Trust Co. v. Railroadmens Federal Sav. & Loan Ass'n,* 806 F.2d 146, 149 (7th Cir.1986)). The burden is on the moving party to show that no genuine issue of material fact is in dispute. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514; *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552; *Matsushita,* 475 U.S. at 585–586, 106 S.Ct. at 1355. There is no genuine issue for trial if the record, taken as a whole, does not lead a rational trier of fact to find for the non-moving party. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–250, 106 S.Ct. at 2511 (citations omitted); *see also Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 659 (7th Cir.1987), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987).

Once the motion is supported by a prima facie showing that the moving party is entitled to judgment as a matter of law, a party opposing the motion may not rest upon the mere allegations or denials in its pleadings, rather its response must show that there is a genuine issue for trial. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552; *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356; *Patrick v. Jasper County,* 901 F.2d 561, 564–566 (7th Cir.1990). The

manner in which this showing can be made depends upon which party will bear the burden of persuasion at trial. If the burden of persuasion at trial would be on the non-moving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either submitting affirmative evidence that negates an essential element of the non-moving party's claim, or by demonstrating that the non-moving party's claim is insufficient to establish an essential element of the non-moving party's claim. *See* 10A *Wright, Miller & Kane,* § 2727, pp. 130–131.

All reasonable inferences to be drawn from the underlying facts must be viewed in a light most favorable to the party opposing the motion. *Davis v. Chicago,* 841 F.2d 186, 189 (7th Cir.1988); *Marine Bank, Nat. Ass'n v. Meat Counter, Inc.,* 826 F.2d 1577, 1579 (7th Cir.1987); *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.1987); *Bartman v. Allis–Chalmers Corp.,* 799 F.2d 311, 312 (7th Cir.1986), *cert. denied,* 479 U.S. 1092, 107 S.Ct. 1304, 94 L.Ed.2d 160 (1987); *In re Calisoff,* 92 B.R. 346, 350–351 (Bankr. N.D.Ill.1988). Furthermore, the existence of a material factual dispute is sufficient only if the disputed fact is determinative of the outcome under the applicable law. *Donald v. Polk County,* 836 F.2d at 379; *Wallace v. Greer,* 821 F.2d 1274, 1276 (7th Cir.1987); *Egger v. Phillips,* 710 F.2d 292, 296 (7th Cir.1983) (en banc), *cert. denied,* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983).

■ Rule 56(d) provides for the situation when judgment is not rendered upon the whole case, but only a portion thereof. The relief sought pursuant to subsection d is styled partial summary judgment. Partial summary judgment is available only to dispose of one or more counts of the complaint in their entirety. *Commonwealth Ins. Co. v. O. Henry Tent & Awning Co.,* 266 F.2d 200, 201 (7th Cir.1959); *Biggins v. Oltmer Iron Works,* 154 F.2d 214, 216–217 (7th Cir.1946); *Quintana v. Byrd,* 669 F.Supp. 849, 850 (N.D.Ill.1987); *Arado v. General Fire Extinguisher Corp.,* 626 F.Supp. 506, 509 (N.D.Ill.1985); *Capitol Records, Inc. v. Progress Record Distributing, Inc.,* 106 F.R.D. 25, 28 (N.D.Ill. 1985); *In re Network 90°, Inc.,* 98 B.R. 821, 823 (Bankr.N.D.Ill.1989) *aff'd In re Network 90 Degrees, Inc.,* 126 B.R. 990 (N.D.Ill.1991); *Strandell v. Jackson County,* 648 F.Supp. 126, 136 (S.D.Ill.1986). Rule 56(d) provides a method whereby a court can narrow issues and facts for trial after denying in whole or in part a motion properly brought under Rule 56. *Capitol Records,* 106 F.R.D. at 29.

Rule 12 of the General Rules of the United States District Court for the Northern District of Illinois, adopted by the General Order of the Bankruptcy Court on May 6, 1986, requires that the party moving for summary judgment file a detailed statement of material facts as to which they contend there is no genuine issue. The statement must include specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the summary judgment relief sought. Rule 12 also requires that the party opposing the motion file a statement of material facts as to which there is a genuine issue. If the opposing party's Rule 12 statement fails to deny the facts set forth in the movant's statement, those facts will be deemed admitted. In the present proceeding, both parties filed a statement of facts. Those statements are incorrectly titled as NCNB's 12(*l*) statement and Windsor's 12(m) statement. *Pasant v. Jackson National Life Ins. Co. of America,* 768 F.Supp. 661, 663–664 n. 2 (N.D.Ill.1991). Effective June 4, 1990, by District Court General Order of May 30, 1990, Rule 12(*l*) was redesignated as 12(m). *Appley v. West,* 929 F.2d 1176, 1178 n. 5 (7th Cir.1991); *Weddington v. United States of America,* 1991 WL 94046, * 8 n. 2 (N.D.Ill.1991). The Court will use the correct local rule denomination when referring to the parties' statements of fact.

### B. *11 U.S.C. § 547*

Section 547(b) of the Bankruptcy Code states:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any

transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enabled such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

■ Section 547(b) requires that the Trustee prove five elements to establish a voidable preference. The elements are as follows: 1) Windsor's interest in property was transferred to or for the benefit of NCNB, a creditor; 2) the Transfer was made for or on account of an antecedent debt; 3) the Transfer was made while Windsor was insolvent; 4) the Transfer was made within ninety days of filing; and 5) the Transfer enabled NCNB to receive more than it would have received if the transferred property had remained in the bankruptcy estate and was distributed under Chapter 7. *In re Energy Cooperative, Inc.*, 832 F.2d 997 (7th Cir.1987); *Barash v. Public Finance Corp.*, 658 F.2d 504, 507 (7th Cir.1981). All elements must be established for the Trustee to recover, and the failure to prove all requisite elements mandates judgment in favor of NCNB. In the present motion only the first element is at issue. NCNB contends that Windsor never had an interest in the proceeds transferred to NCNB by CBT.

■ The Trustee has the burden of proving all elements of preferential transfer by a preponderance of the evidence. *In re Prescott*, 805 F.2d 719, 726 (7th Cir.1986). All elements must be present in order to avoid the Transfer as a preference. *In re Wey*, 854 F.2d 196, 198 (7th Cir.1988). The intent of Congress in enacting section 547(b) was to promote equal distribution among a bankrupt's creditors. *See* H.R.Rep. No. 95–959, 95th Cong., 1st Sess. 178 (1977), *reprinted in* U.S.Code Cong. & Admin.News 5963, 6138 (1978); *see also Barash*, 658 F.2d at 510.

## IV. DISCUSSION

■ For a transfer to be avoided under section 547, "it is essential that the debtor have an interest in the property transferred so that the estate is thereby diminished." *Coral Petroleum, Inc. v. Banque Paribas–London*, 797 F.2d 1351, 1355–1356, *reh'g denied*, 801 F.2d 398 (5th Cir. 1986). Pointing to the literal language of the statute, NCNB argues that Windsor had no interest in the New Loan proceeds transferred to it by CBT. The pertinent portion of section 547 on which NCNB relies states:

the trustee may avoid any *transfer of an interest of the debtor* in property—....
(emphasis added).

11 U.S.C. § 547(b).

NCNB's motion invokes the "earmarking doctrine." This equitable doctrine provides that when a new lender makes a loan to enable a debtor to pay a specified former lender, those funds are "earmarked" for that creditor. *In re Hartley*, 825 F.2d 1067, 1070–1071 (6th Cir.1987). Accordingly, if the debtor has no control over the disposition of the earmarked funds then no preference occurs. *In re BNT Terminals, Inc.*, 125 B.R. 963, 970 (Bankr.N.D.Ill. 1990). NCNB argues that the New Loan proceeds were earmarked for the creditors listed in Schedule 7 which included NCNB, and therefore those funds never became part of Windsor's estate.

The Trustee's response first challenges any application of the earmarking doctrine. The Trustee contends that NCNB's defens-

es are limited to only those seven enumerated defenses found in section 547(c)(1) through (7). Because section 547 fails to codify the earmarking doctrine, the Trustee concludes it cannot be raised as a defense to an action thereunder. By invoking the earmarking doctrine, NCNB merely challenges the Trustee's ability to establish all the prima facie elements of a preference, not the applicability of one or more of the statutory defenses under section 547(c) to an otherwise avoidable preferential transfer. In the simplest terms, NCNB contends that its part of the New Loan proceeds transferred was not property in which Windsor had an interest, and therefore, the Transfer fails to meet that threshold element of a preference.

Analyzing the logical conclusion of the Trustee's reasoning highlights the flaw in his position. The Trustee concludes that a party may only raise those defenses specifically enumerated under section 547(c)(1) through (7). If true, a preference defendant would be precluded from challenging and defending any alleged preferential transfer on grounds such as lack of standing, want of jurisdiction, or improper service of process. Such threshold defenses, however, are potentially available to all preference defendants, notwithstanding the Trustee's contention that only section 547(c)(1) through (7) defenses exist to the merits of a preference action. The Court rejects the Trustee's argument and concludes that NCNB's invocation of the earmarking doctrine is permissible. Next, a discussion of the equitable doctrine and its basis under the statute is appropriate.

A preferential transfer occurs only if the debtor has an interest in the property transferred. 11 U.S.C. § 547(b). The term "interest of the debtor in property," as used in section 547(b), however, is undefined by the Bankruptcy Code. *See Begier v. IRS*, 496 U.S. 53, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990) (property of the debtor that is subject to 11 U.S.C. § 547(b) is best understood as property that would have been part of the bankruptcy estate had it not been transferred before the commencement of bankruptcy proceedings); *In re Bullion Reserve of North America*, 836 F.2d 1214, 1217 (9th Cir.), *cert. denied*, 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988) ("[g]enerally, property belongs to the debtor for the purposes of § 547 if its transfer will deprive the bankruptcy estate of something which could otherwise be used to satisfy the claims of creditors."); *In re Bellanca Aircraft Corp.*, 850 F.2d 1275 (8th Cir.1988) (because property of the estate under 11 U.S.C. § 541 includes all legal or equitable interests of the debtor in property, property of debtor as used under 11 U.S.C. § 547(b), is equivalent to property of the estate); *In re Lewis W. Shurtleff, Inc.*, 778 F.2d 1416, 1419 (9th Cir.1985) ("[t]he term 'property' used in section 547 enjoys a similarly broad scope [as section 541].");  *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) (property interests are created and defined by state law). As *Butner* mandates, the Court must first look to state law to determine the existence and scope of any interest in property. It is the Bankruptcy Code, however, that defines the scope of any property interest transferred to (or from) the estate. 11 U.S.C. § 541; *BNT Terminals*, 125 B.R. at 968.

The earmarking doctrine may apply where funds are loaned or given to a debtor which are intended for a particular party. *Coral Petroleum*, 797 F.2d at 1355–56; *BNT Terminals*, 125 B.R. at 970; *see In re Network 90 Degrees, Inc.*, 126 B.R. 990, 994 (N.D.Ill.1991). The Eighth Circuit noted:

> In every earmarking situation there are three necessary dramatis personae. They are the "old creditor", (the pre-existing creditor who is paid off within the 90–day period prior to bankruptcy), the "new creditor" or "new lender" who supplies the funds to pay off the old creditor, and the debtor.

*In re Bohlen Enterprises, Ltd.*, 859 F.2d 561, 565 (8th Cir.1988).

Courts applying this doctrine have reasoned that when a new lender makes a loan to a debtor to enable it to repay a specified former lender, the proceeds of that new loan do not become part of the debtor's estate, and thus there is no transfer of

property in which the debtor has an interest. *Bohlen*, 859 F.2d at 565; *Coral Petroleum*, 797 F.2d at 1356; *Network 90*, 126 B.R. at 994. NCNB contends that the New Loan proceeds were intended for and paid directly to an old creditor (NCNB) from a new creditor (the Lenders). Because such funds never came under the control of Windsor, and thus were not part of the estate, NCNB concludes that any transfer of same was not preferential under section 547.

The Trustee next challenges NCNB's alleged application of the earmarking doctrine. Citing *Bohlen* for support, the Trustee contends that the doctrine, if applicable at all, applies only to situations protecting guarantors or sureties. A complete and concise analysis of the history, purpose and application of the earmarking doctrine is provided in the *Bohlen* decision. It is unnecessary to repeat that analysis here. *Bohlen* observed that the doctrine has its origins in protecting parties secondarily liable. *Bohlen*, 859 F.2d at 565. Since that time, the *Bohlen* court noted, with criticism, other courts have expanded the doctrine beyond the guarantor scenario and have applied it to situations where the new creditor is not a guarantor, but rather a new lender who paid a pre-existing creditor. *Id.* at 566. Based upon the *Bohlen* court's criticism, the Trustee concludes that the expansion of the earmarking doctrine to the present proceeding where NCNB was neither a guarantor nor a surety is unwarranted.

■ The Trustee's reasoning is not compelling. First, *Bohlen* is not controlling on this Court. Second, nothing in *Bohlen* logically leads to the conclusion that the earmarking doctrine should be limited in its application to protect only parties secondarily liable. As the Eighth Circuit stated:

It is not necessary for us to decide whether the earmarking doctrine, as thus far enunciated in non-guarantor situations, should be preserved, limited, or even rejected entirely.

*Bohlen*, 859 F.2d at 564.

Third, even though *Bohlen* criticized the application of the doctrine to situations not involving parties secondarily liable, the doctrine has found ample support in the judicial gloss of the present Bankruptcy Code and former Bankruptcy Act. *In re Hartley*, 825 F.2d 1067, 1070–1071 (a loan substituting one creditor for another with no attendant diminution to the estate is not a preferential transfer); *Coral Petroleum*, 797 F.2d at 1356 (where debtor never had control of collateral pledged for repayment of loan no preference occurred upon transfer of funds); *Network 90*, 126 B.R. at 994 (foundation of the earmarking doctrine lies in the debtor's control over property transferred); *BNT Terminals*, 125 B.R. at 970 (the earmarking doctrine involves the substitution of creditors); *In re Belme*, 76 B.R. 121 (Bankr.S.D.Ohio 1987) (the earmarking doctrine is a valid defense to preference action); *In re Borgman*, 48 B.R. 666, 668 (Bankr.W.D.Mo.1985) (funds were earmarked and therefore never became part of debtor's estate); *In re Castillo*, 39 B.R. 45, 47 (Bankr.D.Colo.1984) (no preference occurred, for when transfer "was nothing more than a substitution of one creditor for another no diminution of the debtor's estate resulted."); *see Grubb v. General Contract Purchase Corp.*, 94 F.2d 70 (2d Cir.1938) (earmarking exists under the former Bankruptcy Act where the new lender pays the old creditor directly); *see also Kapela v. Newman*, 649 F.2d 887, 893 (1st Cir.1981) (decided under the Bankruptcy Act where the court noted, "[t]he key question when assets are transferred so as to benefit a guarantor is whether those assets would ordinarily have been available to help satisfy the claims of other (general) creditors."). Lastly, prior decisions rendered in this District without such reservation and restriction in favor of only guarantors and sureties have recognized, where appropriate, the use of the earmarking doctrine to defend against preference avoidance actions. *Network 90*, 126 B.R. at 994; *BNT Terminals*, 125 B.R. at 970. The Trustee's claim that the expanded doctrine should not apply to the present proceeding thus fails.

■ Although a controlling formula has not been adopted in this District or Circuit

for applying the earmarking doctrine, courts have generally focused on the debtor's control over the property transferred and the attendant impact upon the debtor's estate of any such transfer. *Bohlen*, 859 F.2d at 566; *Hartley*, 825 F.2d at 1070; *Coral Petroleum*, 797 F.2d at 1361; *Network 90*, 126 B.R. at 994. In clarifying the application of the earmarking doctrine, the *Bohlen* court identified three requirements or factors for a transaction to qualify thereunder:

1. the existence of an agreement between the new lender and the debtor that the new funds will be used to pay a specified antecedent debt;

2. performance of that agreement according to its terms; and

3. the transaction viewed as a whole (including the transfer in of the new funds and the transfer out to the old creditor) does not result in any diminution of the estate.

*Bohlen*, 859 F.2d at 566.

The *Bohlen* court further noted that a fourth factor—whether the debtor had "control" over the funds provided by the new lender—is often invoked. Control plays an important role; even if the debtor physically or actually receives funds, there can still be an earmark if the debtor's lack of dispositive control over the funds is proven. *Coral Petroleum*, 797 F.2d at 1361. Therefore, the Court concludes that the proper application of the earmarking doctrine involves consideration of four essential elements: (1) existence of an agreement between the debtor and the new creditor for repayment of an antecedent debt; (2) the performance of this agreement by which the old creditor receives the agreed consideration; (3) the debtor's lack of dispositive control over the transferred property; and (4) the transfer's impact on the estate, namely whether the transfer depleted the debtor's estate. *Coral Petroleum*, 797 F.2d at 1361; *Network 90*, 126 B.R. at 994. Recent authority from this district has addressed these factors in *In re Network 90 Degrees, Inc.*, 126 B.R. 990 (N.D.Ill.1991).

In *Network 90*, concerning the factor of control in order to assure continued supplies from its largest creditor, the debtor agreed to forward all customer checks to the creditor, without endorsement, to grant the creditor a power of attorney to endorse all checks made payable jointly to creditor and debtor, and to allow the creditor to endorse the checks and apply the proceeds to the debtor's outstanding balance. 126 B.R. at 992. Under this agreement, the creditor negotiated several checks within the preference period. *Id.* The trustee sought to avoid the transfer of those checks under section 547. *Id.* The district court held that the payments were not property of the estate because the debtor lacked "any control over these payments." *Id.* at 995.

In this matter, NCNB points to the New Loan agreement and Alderman's testimony as showing a similar lack of control by Windsor over the New Loan proceeds. NCNB claims paragraph 5.01 of the New Loan agreement allowed the proceeds to be used only for the payment of existing indebtedness listed in Schedule 7. Moreover, NCNB contends that CBT's wiring payments to the recipients listed in Schedule 7 further demonstrates the "control" the Lenders exercised over the proceeds, or conversely, the lack of any control exercised by Windsor. Thus, NCNB concludes the "control" element of the earmarking doctrine is satisfied.

The Trustee concedes that the New Loan agreement prohibited the use of the proceeds for any other purpose than the payment of the creditors listed in Schedule 7. [12(n) Statement, ¶ 17]. It is also undisputed that CBT wired the Transfer directly to NCNB as required by the New Loan agreement. *Id.* The Trustee contests, however, that the agreed use of the New Loan proceeds to pay existing debt adequately demonstrates that Windsor relinquished control over the loan proceeds to satisfy the two initial elements of *Bohlen*. The Trustee argues that Windsor's concession, when negotiating the New Loan, to allow the proceeds to be used to pay NCNB, shows that Windsor did exercise some degree of con-

trol over the disposition of funds. For support, the Trustee relies upon *In re Ludford Fruit Products, Inc.*, 99 B.R. 18 (Bankr.C.D.Cal.1989). The *Ludford* decision has no application, and is readily distinguished on its facts from the case at bar.

In *Ludford*, the debtor executed security agreements on behalf of a creditor in "then existing and after-acquired general intangibles and proceeds" to secure repayment of loans. 99 B.R. at 20. The trustee sought to avoid several payments made by the debtor to the creditor within ninety days of the debtor's bankruptcy. *Id.* The creditor claimed the debtor's payments qualified as collateral subject to its pre-petition interest, and thus were earmarked for the creditor. Noting that only section 547(b)(5) was disputed, the court refused to apply the earmarking doctrine. The court restricted the doctrine's application to situations where "a non-debtor party directly satisfies the claim of the debtor's creditor with the non-debtor party's own property or funds." *Id.* at 21. The court concluded that because the funds had been paid by the debtor and not a third party, the earmarking doctrine had no application. *Id.*

The *Ludford* facts are substantially different from the facts in the present proceeding. Here, the third-party Lenders used the funds of the New Loan to satisfy claims of Windsor's creditors which included NCNB who was directly repaid by CBT, not Windsor. In *Ludford*, however, the debtor paid a secured creditor from the debtor's assets to which a security interest attached. Windsor's agreement to allow the New Loan proceeds to pay existing indebtedness does not rise to the level of control that the *Ludford* debtor exercised over its own inventory and proceeds thereof subject to a secured interest. In *Ludford*, the debtor paid the creditor from proceeds derived from the debtor's business. The *Ludford* debtor had complete control and discretion as to whether proceeds would be paid to the creditor as well as the time that such proceeds were to be paid. In contrast to *Ludford*, Windsor relinquished any actual or effective control over the disposition of the New Loan proceeds at the time it signed the New Loan

agreement. Further, Windsor never regained control, if it ever existed, as demonstrated by CBT's wiring of funds to NCNB.

NCNB has successfully established an agreement and compliance with that agreement which effectively precluded Windsor from exercising control over the New Loan proceeds. *Bohlen*, 859 F.2d at 566. Thus, the Court must determine whether the Transfer operated to diminish Windsor's estate to see if the final factor of the earmarking doctrine has been shown. *Id.; Network 90*, 126 B.R. at 995.

■ A transfer causing a diminution of the debtor's estate involves a transfer of the debtor's property. *Network 90*, 126 B.R. at 995 ("[a]ccordingly, the payments were not property of the estate and transfer of them ... did not diminish the estate for purposes of §§ 547 or 549."). NCNB contends that because the New Loan was unsecured, no transfer of unencumbered assets occurred which could have depleted Windsor's estate. NCNB further argues that the release of its security by virtue of CBT paying NCNB from the New Loan proceeds actually increased the unencumbered assets of the estate. The Trustee responds that prior to the New Loan agreement, Windsor was liable to NCNB for only $13,177,250.00, but pursuant to the New Loan agreement it became jointly and severally liable to the Lenders for $150,000,000.00. Thus, the Trustee reasons that Windsor's increased joint and several liability resulting from the New Loan substantially diminished the value of its estate, notwithstanding the reduction of Windsor's previous debt to NCNB.

■ When evaluating the impact a transfer has on the estate, the Court looks to the transaction as a whole. *In re Hood*, 118 B.R. 417, 420 (Bankr.S.C.1990). In applying the earmarking doctrine, most frequently, one creditor is substituted for another. A dollar for dollar swap is also typically the end result when earmarked funds have been transferred to a preexisting lender. *Hartley*, 825 F.2d at 1069.

■ The net effect of the Transfer on Windsor's estate creates a substantial

issue of material fact which cannot be resolved short of trial. NCNB contends that Windsor had pledged "most if not all" of its assets to NCNB as security for the $25,000,000.00 line of credit. Pointing to the increase in assets resulting from NCNB's release of stock upon the payment of $13,177,250.00, NCNB argues that the Transfer actually increased the value of the estate. According to NCNB, the Court should look only at Windsor's assets and not its liabilities when evaluating the impact of the Transfer because the estate is an aggregation of property, not liabilities. The Court does not look to only one side of the balance sheet when evaluating the impact a transfer has upon a debtor's estate. Looking solely to the change in assets without analyzing the attendant change in liabilities overlooks the full economic effect that a transfer has on an estate. Most significantly, neither party has provided any evidence which identifies Windsor's assets and liabilities both immediately before and after the Transfer, thereby leaving a material issue of fact unresolved. The lack of such evidence is fatal to the motion for partial summary judgment.

NCNB attempts to clarify this incomplete factual picture by explaining that the net effect of substituting lenders resulted in only a $1.02 increase in Windsor's liability. NCNB contends that the Lenders collectively filed claims aggregating $150,000,-000.00 against Windsor's estate. The aggregate amount allowed under the confirmed plan of liquidation in Windsor's estate, however, is only $15,674,135.00. Because Windsor concedes to receiving $15,-674,133.98 due to the New Loan agreement (NCNB Exhibit No. H, ¶ 17), NCNB thus concludes that the difference negatively impacted the estate by only $1.02 which essentially constitutes a dollar for dollar swap.

Probing beneath the numbers, the New Loan's impact on the estate at the time of the Transfer, as opposed to the result under the confirmed plan of liquidation, is anything but clear. On May 6, 1988, CBT wired $13,177,250.00 to NCNB. Shortly thereafter, NCNB returned Windsor's stock held as security on the NCNB line of credit. Concurrent with the execution of the New Loan, Windsor became jointly and severally liable for $150,000,000.00. The full impact of this transaction upon Windsor's estate at that time is unknown because the complete scope of Windsor's estate, both before and after the Transfer, is not shown in the moving papers. The fact that the claims of $150,000,000.00 were subsequently compromised down to only $15,000,000.00 at the time of plan confirmation has no bearing on any alleged diminution to the estate resulting from the Transfer at the time it was made. Absent a complete factual explanation as to how the Transfer impacted Windsor's estate, the Court is precluded from granting judgment as a matter of law. To argue the effect the Transfer had on Windsor's estate, without providing sufficient and comprehensive evidence to establish the value of the estate in terms of both its assets and liabilities, immediately before and after the Transfer, really begs the question and assumes as true what must be proved.

## V. CONCLUSION

For the foregoing reasons, the Court hereby denies the motion for partial summary judgment on Count I of the complaint. This Opinion is to serve as findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

See written Order.